[No. S019697. June 30, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CARMEN LEE WARD, Defendant and Appellant.

## Counsel

Robert Franklin Howell, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Sharlene A. Honnaka and Kenneth N. Sokoler, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN, J.**—Defendant Carmen Lee Ward was charged in a single information with the first degree murders of Ronald Stumpf and David Adkins (Pen. Code, § 187, subd. (a); all undesignated statutory references are to the Penal Code) and the attempted murder of Kenneth Shy (§§ 187, 664). The information further alleged a multiple-murder special circumstance (§ 190.2, subd. (a)(3)) and enhancements for the infliction of great bodily injury (§ 12022.7) and firearm use (§ 12022.5). After the trial court granted defendant's motion to sever the murder charges, a jury convicted him of the second degree murder of Stumpf and found the firearm use allegation to be true. A second jury then convicted him of the first degree murder of Adkins and the attempted murder of Shy and returned true findings on the enhancement allegations.[1] After a separate proceeding, the jury found true the special circumstance that defendant had been previously convicted of murder in the second degree. (§ 190.2, subd. (a)(2).) Following the penalty phase trial, the jury returned a verdict of death.

---

[1] All of defendant's convictions occurred under the same case number, Los Angeles Superior Court No. A647633.

Following the verdict, the trial court denied defendant's motion for a new trial and his automatic motion for modification of the verdict. The court then sentenced defendant to (1) 15 years to life for the second degree murder of Stumpf plus two consecutive years for the firearm enhancement, (2) death for the first degree murder of Adkins plus two consecutive years for the firearm enhancement, and (3) life with the possibility of parole for the attempted murder of Shy plus two consecutive years for the firearm enhancement and three consecutive years for the great bodily injury enhancement. The court stayed the sentences for the murder of Stumpf, the attempted murder of Shy, and the enhancements pending appeal, with the stays becoming permanent upon execution of the death sentence.

This appeal is automatic. (§ 1239.) We find no reversible error as to guilt or penalty and affirm the judgment in its entirety.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Guilt Phase*

#### 1. *Murder of Ronald Stumpf*

In the late evening of October 3, 1987, Ronald Stumpf told his wife he was going out to play pool. Driving his 1972 Toyota down Long Beach Boulevard about 30 minutes later, he spotted George Springer, an acquaintance who had previously assisted him in buying rock cocaine. Springer approached Stumpf, and Stumpf asked where he could "go score." With Springer in the passenger seat giving directions, Stumpf drove to Norton Avenue, where they saw defendant—with whom Springer had previous drug dealings—standing on the sidewalk with another person in the vicinity.

They pulled up to defendant, and defendant, standing on the passenger side, asked what they wanted. Springer indicated they needed a $20 piece of cocaine and defendant handed a rock to Stumpf, who was holding money in his hand. According to Springer, Stumpf passed it back to defendant because the rock was too small. Perceiving Stumpf had broken a piece of the rock, defendant said something like, "You broke my shit." He then pulled a gun, leaned in the passenger side, and fired several times from close range at Stumpf's chest. Springer testified he crouched down and his ears began to ring as smoke and fire came from the gun. When the shooting stopped, he saw Stumpf's upper body covered with blood.

Because Stumpf had left the engine running and the car in gear when they had first approached defendant, the vehicle began to move along Norton Street. Springer attempted to gain control and managed to steer the car

toward a used car lot, where it jumped the curb and hit a metal pipe. Springer got out and ran home. He did not call the police and lied to his wife when she saw blood on him. The next day, he went to church and spoke with an old friend, Reverend Tinson, about what had happened. Tinson advised him to go to the police, which he eventually did. Initially, however, Springer did not identify defendant for fear of reprisal. Several months later, he also lied when shown defendant's photograph, saying he did not recognize anyone. Only when threatened with incarceration for withholding evidence did he acknowledge defendant as the shooter.

At the time of the shooting, Jorge Castenada was outside his apartment on Norton Avenue and saw Stumpf and Springer drive up to where three men were standing. He heard shots, but did not see anyone with a gun. After the shots, he saw the car take off and crash into a metal pole and Springer get out and run off. Castenada went to the vehicle and saw blood, then called the police.

Stumpf died at the scene. The autopsy revealed four gunshot wounds, two of which were the cause of death. The shots had been fired from close range. The police also found two expended bullets in the Toyota. According to a ballistics expert, the expended bullets and fragments recovered from the car and Stumpf's body were all either .38- or .357-caliber and had similar lands and grooves. The expert could not, however, determine whether they had been fired from the same weapon.

Defendant testified and offered an alibi defense. According to defendant, on the evening of the shooting, he went with a friend, Betty Robinson, to Hollywood to see a movie. They arrived about 11:00 p.m. and left about 12:15 a.m. Driving back on the freeway, defendant's car's engine cut out. Thirty or 45 minutes later, Louis Hansbrough pulled over and gave him assistance. At trial, Hansbrough confirmed he had stopped to help defendant, but could not remember the date. Despite the efforts of a private investigator, the defense was unable to locate Robinson.

Defendant denied being at the scene of the shooting or killing Stumpf.

### 2. *Murder of David Adkins; Attempted Murder of Kenneth Shy*

On the evening of February 20, 1988, David Adkins and Kenneth Shy were on the corner of Lilita Street and Benwell Drive in Lynwood when they were joined by Roger Outley and Donald Jacobs. The area was associated with the Lynwood Neighborhood Crips, a gang also known as "N-Hood" or "Neighborhood" whose members were rivals of the Ghost Town Crips. Defendant and Anthony Bereal belonged to the Ghost Town Crips.

As Adkins, Shy, Outley, and Jacobs stood talking, they saw defendant, wearing a black jacket, and Bereal, wearing a brown Pendleton shirt, walk up Benwell Drive with their hands behind their backs. When they were about 100 yards away, Adkins said, "There's some Ghost Town." Outley had noticed both defendant and Bereal in the area previously. As the two approached, Bereal said, "What's the neighborhood like?" Initially, no one replied, and Bereal repeated "This is Neighborhood" several times. When defendant and Bereal began to walk away, Adkins said, "This is Neighborhood," as if he agreed with Bereal. At that moment, defendant pulled a gun from his jacket and began shooting, hitting Adkins from 10 to 12 feet away. He then went up to the wounded Adkins lying in the street and shot him again at point-blank range. In the meantime, Shy had started riding away on his bicycle, and defendant shot at him also, hitting him in the upper thigh.

Outley testified he was positive defendant, not Bereal, had fired the gun and did not tell the police otherwise. Although he had not seen defendant before that night, Jacobs made the same positive identification. Shy was also certain defendant was the person who shot him. In addition to these percipient witnesses, several others gave corroborating versions of events. Adkins's cousin, Chrishon Tiffith, saw defendant and another individual approach Adkins, Shy, Outley, and Jacobs and saw one of them, wearing a black jacket, shoot Adkins. Another cousin, Kimbali Walker, was with Tiffith and similarly testified that the person wearing a black jacket was the one who fired on Adkins. Others, including Beverly Blanchard, Kenneth Sledge, Rose Marie Barner, and Blise Bostick, stated that they had seen defendant and Bereal in the vicinity of the shooting and that defendant matched the description of the shooter—shorter of the two with Jheri-curled hair and wearing a black jacket.

Adkins later died from loss of blood from two gunshot wounds. Outley and Shy identified defendant to the police as the shooter. Jacobs initially declined to do so out of fear for his safety. The prosecution presented expert testimony regarding gang culture, including reasons gang members would walk into rival territory and their likely interpretation of gang references as challenges.

The defense was mistaken identity and alibi. According to one police report, Bereal was listed as suspect No. 1, which generally indicated the suspect who committed the crime. Mario Macias testified that on the evening of February 20, 1988, he saw defendant and Bereal at a party on Norton Avenue. He was with them the entire evening until he left about 1:00 a.m. The defense also presented testimony from Aaron Belyeu suggesting the police wanted "to nail" defendant even though they believed Bereal was the shooter.

## B. *Penalty Phase*

Because the murder charges were tried separately, the prosecution presented additional evidence of the Stumpf killing as one of the factors in aggravation. (See § 190.3, factor (b).) There was also evidence defendant possessed sharpened toothbrushes in jail, had a physical altercation with police during a traffic stop in October 1987, and participated in a melee involving gang members at Lynwood Park in May 1987. The prosecution also introduced defendant's prior conviction in 1989 for possessing cocaine. (Health & Saf. Code, § 11350; see Pen. Code, § 190.3, factor (c).)

As part of the case in mitigation, the defense questioned Jorge Castenada about the Stumpf killing and discrepancies in his testimony at the original trial. The defense also challenged the prosecution's version of the Lynwood Park melee and offered testimony from defendant's mother and stepfather as well as other family members attesting to his love and respect for them and his helpfulness. They all loved him and did not want him to be executed.

## II. DISCUSSION

### A. *Appointment of Counsel Issues*

#### 1. *Discharge of Second Counsel Following Severance*

The prosecution originally charged the murders of Stumpf and Adkins in one information and alleged a multiple-murder special circumstance. (§ 190.2, subd. (a)(3).) After determining defendant qualified for the appointment of counsel, the trial court appointed Morris Jones. In light of the special circumstances allegation and the prosecution's announced intention to seek the death penalty, the court also appointed Ronald Skyers as second counsel pursuant to section 987, subdivision (d). After defendant successfully moved to sever the murder charges, however, the court relieved Skyers for the initial trial of the Stumpf killing. Defendant now contends this action deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Skyers, who became lead counsel at the beginning of the second trial, was deprived of the opportunity to evaluate the demeanor of witnesses and to adequately prepare himself for the ultimate penalty phase.

We find no error. Section 987, subdivision (d) provides for additional counsel only "[i]n a capital case," i.e., one in which a special circumstance has been alleged and the prosecution seeks the death penalty. Defendant's trial for the killing of Ronald Stumpf involved no special circumstance allegations. Thus, once the court granted defendant's severance motion, the

trial for the killing of Stumpf was no longer a capital case but simply a first degree murder prosecution. Indeed, following severance, defendant faced the specter of the death penalty only if he were convicted of the first or second degree murder of Stumpf. (See § 190.2, subd. (a)(2); cf. *Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [204 Cal.Rptr. 700, 683 P.2d 699].) As such, the court had no authority to maintain Skyers as second counsel until that time. (See *Sand v. Superior Court* (1983) 34 Cal.3d 567, 575 [194 Cal.Rptr. 480, 668 P.2d 787] [holding that the defendant was not entitled to ancillary defense services under § 987.9 because he no longer faced the death penalty].) The fact that defendant may not have had the benefit of Skyers's participation in the Stumpf trial during the Adkins-Shy trial resulted from defendant's successful motion to sever the murder charges, not from any error on the part of the trial court in relieving Skyers until the matter became a capital case. Moreover, as the court noted when this point was raised at trial: "[I]t would be no different than having a prior conviction [for first or second degree murder] and having to do it again."

### 2. *Withdrawal of Lead Counsel at Commencement of Second Trial*

On the morning the Adkins-Shy trial was about to commence, Morris Jones told the court that he would not be able to participate as defendant's counsel because the day before he had been appointed to the bench and was therefore no longer a practitioner of law. He also indicated that he had explained this to defendant. The court relieved Jones as counsel, designated Skyers as lead counsel, and appointed Ronald Higgins as second counsel. Defendant now contends the court erred in permitting Jones to withdraw under the circumstances in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

We find no error. Under the California Constitution, "[a] judge of a court of record may not practice law . . . ." (Cal. Const., art. VI, § 17; see *In re Craig* (1938) 12 Cal.2d 93, 96 [82 P.2d 442].) Since the trial court had no viable alternative, it had no obligation to conduct a hearing prior to relieving Jones. The contrary authorities cited by defendant all involved attorneys who were authorized to practice law but sought to withdraw for some collateral reason.

Defendant speculates from the record that the court and counsel had some off-the-record discussion in his absence regarding Jones's judicial appointment and need to withdraw, and that his exclusion from this discussion violated his rights. Even assuming that such a discussion occurred, we find no prejudice because, as noted, the trial court was constitutionally foreclosed from requiring Jones to continue his participation.

B. Wheeler/Batson *Issues*

During jury selection, the prosecutor exercised his first two peremptory challenges against Juanita D., an African-American woman, and Lawrence H., an African-American man. Defense counsel objected and made a motion pursuant to *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. The trial court declined to find a prima facie violation and denied the motion. After the prosecutor exercised his fourth peremptory challenge against Charlotte B., an African-American woman, defense counsel made a second *Wheeler* motion. Although the trial court did not at that point "feel there [was] a conscious exclusion," it observed that the prosecutor had excused a total of three out of the eight African-American jurors—two out of the seven African-American women—on the panel and invited an explanation. Following the prosecutor's explanation, the court denied the motion. Defense counsel made his third *Wheeler* motion after the prosecutor exercised his next peremptory challenge against Mary E., an African-American woman. Without prompting, the prosecutor offered an explanation, and the trial court denied the motion.

Following voir dire of a second group of jurors, the prosecutor exercised his sixth peremptory challenge against Rose B., an African-American woman. Defense counsel then made his fourth *Wheeler* motion. After the trial court prompted the prosecutor, he offered a lengthy explanation for this latest challenge. The trial court accepted the explanation and denied the motion. The prosecutor exercised one more peremptory challenge against a Caucasian man, and the prosecutor and defense counsel then accepted the jury as constituted.

During selection of the alternate jurors, the prosecutor exercised his first peremptory challenge against Harriette V., an African- American woman. Defense counsel made another *Wheeler* motion. Although the trial court apparently declined to find a pattern of impermissible exclusion because selection of the alternate jurors had just begun, it invited an explanation from the prosecutor. The prosecutor offered an explanation for this challenge, and his next challenge to Carolyn P., an African-American woman. At this point, defense counsel indicated that he would also object to the prosecutor's proposed challenge to Carolyn P. Again, the trial court denied the motions. The prosecutor exercised one more peremptory challenge before the parties accepted the alternates as constituted.

On appeal, defendant renews these *Wheeler* claims and contends the prosecutor violated his rights under the state and federal Constitutions. Assuming without deciding that defendant preserved the federal claim, we deny his claims.

■ "The use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution (*People v. Wheeler*[, *supra*, 22 Cal.3d at pp. 276–277]) as well as the equal protection clause of the Fourteenth Amendment to the United States Constitution. (*Batson v. Kentucky* [(1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 106 S.Ct. 1712]].)" (*People v. Burgener* (2003) 29 Cal.4th 833, 863 [129 Cal.Rptr.2d 747, 62 P.3d 1].) "A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors has been excluded on the basis of group or racial identity. . . . Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenge at issue." (*People v. Jenkins* (2000) 22 Cal.4th 900, 993 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) " '[T]he trial court must then decide . . . whether the opponent of the strike has proved purposeful . . . discrimination.' " (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

■ "The trial court's ruling on this issue is reviewed for substantial evidence." (*People v. McDermott, supra,* 28 Cal.4th at p. 971.) "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener, supra,* 29 Cal.4th at p. 864.) "[I]n fulfilling [this] obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's [nondiscriminatory] reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's [nondiscriminatory] reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].)

In this case, the People concede that, with respect to defendant's fourth *Wheeler* motion, "the preliminary issue of whether the defendant [has] made a prima facie showing" is moot, and this court must therefore examine the adequacy of the prosecutor's explanation. (See *Hernandez v. New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859].) Although the parties apparently disagree over whether this concession is sufficient to require an examination of the adequacy of all of the prosecutor's explanations or whether a prima facie showing with respect to the other *Wheeler* challenges

had been or should have been found by the trial court, we find it unnecessary to resolve these questions here. Even assuming a prima facie showing as to all the challenged jurors, we find substantial evidence to support the trial court's denial of defendant's claim under either *People v. Wheeler, supra*, 22 Cal.3d 258, or *Batson v. Kentucky, supra*, 476 U.S. at page 79.[2]

In justifying his challenges to Juanita D., Charlotte B., Mary E., Harriette V., and Carolyn P., the prosecutor cited their responses to *Hovey* questioning (*Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]) and his perception that these jurors were likely to be hesitant to impose the death penalty. With respect to Juanita D. and Carolyn P., defendant concedes that the prosecutor's "stated reason is supported by the record," and our review of the record confirms that the prosecutor could reasonably view Juanita D. and Carolyn P. as unfavorable on the death penalty issue. We therefore see no basis for reversing the trial court's denial of defendant's *Wheeler* motion as to either prospective juror. (See *People v. McDermott, supra*, 28 Cal.4th at pp. 972–973 [finding that substantial evidence of a juror's hesitance to impose the death penalty supported the trial court's denial of the *Wheeler* motion].)

We reach the same conclusion as to Charlotte B. and Mary E. Our review of the record reveals substantial evidence supporting the prosecutor's explanation that both of these jurors expressed some reluctance in imposing the death penalty during *Hovey* questioning. For example, Charlotte B., in response to a question from the prosecutor asking whether she could impose the death penalty if the evidence made it appropriate, stated: "I can do that, but I would rather not." She also stated that she was "not strongly" in favor of the death penalty. Similarly, Mary E., in response to a question asking whether she would automatically vote for life without parole in every case, answered with some apparent hesitancy: "I don't think I would, no. I wouldn't." She also acknowledged that she "might" find it "difficult" to vote for the death penalty and noted that "extenuating circumstances," such as the person's "particular environment," may lessen that person's responsibility for his actions. Accordingly, we find substantial evidence to support the trial court's denial of defendant's *Wheeler* motion as to both Charlotte B. and Mary E. (See *People v. Burgener, supra*, 29 Cal.4th at p. 864 ["A prosecutor legitimately may exercise a peremptory challenge against a juror who is skeptical about imposing the death penalty"].)

---

[2] In *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2419] (*Johnson*), the United States Supreme Court recently reversed our decision in *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270], and held that "California's 'more likely than not' standard is at odds with the prima facie inquiry mandated by *Batson*." Because we assume that defendant made a prima facie showing, *Johnson* does not affect our holding here.

■ In addition, we find substantial evidence to support the challenge to Harriette V. based on "her demeanor" during questioning—which, according to the prosecutor, suggested that she was a "death skeptic." Specifically, the trial court expressly confirmed that it had also observed that Harriette V.'s "manner" during *Hovey* questioning suggested a reluctance to impose the death penalty. Because we give " 'great deference' on appeal" to the trial court's observations regarding a "prospective juror's demeanor" and nothing in the record contradicts these observations, we see no grounds for reversing the court's decision to deny defendant's *Wheeler* motion as to Harriette V. (*People v. Reynoso, supra,* 31 Cal.4th at p. 926.)

■ The record also provides substantial evidence to support the trial court's finding that the prosecutor's reasons for challenging Lawrence H. and Rose B. were nondiscriminatory. With respect to Lawrence H., the prosecutor cited Lawrence H.'s apparent antagonism toward him during questioning. The record reveals that Lawrence H. expressed some hostility toward the prosecutor in response to the prosecutor's questioning regarding his knowledge of gangs, and the trial court expressly confirmed its recollection of this hostility. Defendant contends the prosecutor intentionally provoked this hostility but cites nothing in the record to support his contention. Indeed, our review of the record reveals that the prosecutor's questions appeared innocuous and, in any event, were appropriate. Where, as here, the record supports a finding that a prospective juror evinced "a degree of hostility toward the prosecutor," we find that substantial evidence supports the trial court's denial of defendant's *Wheeler* claim. (*People v. Farnam* (2002) 28 Cal.4th 107, 138 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

■ With respect to Rose B., the prosecutor cited a number of reasons for challenging her, including (1) her responses in her juror questionnaire; (2) her unconventional appearance—i.e., wearing 30 silver chains around her neck and rings on every one of her fingers—which suggested that she might not fit in with the other jurors; and (3) her "body language" during questioning suggesting that she was "uptight with" the prosecutor. The first cited reason is supported by the record, which establishes that Rose B. described the death penalty as a "horrible thing" in her juror questionnaire. This alone supports the denial of defendant's *Wheeler* motion. (See *People v. Burgener, supra,* 29 Cal.4th at p. 864.) Moreover, the trial court's implied finding that the prosecutor's stated reasons were sincere and genuine is entitled to great deference where, as here, the reasons are based on the prospective juror's appearance and demeanor. (See *People v. Reynoso, supra,* 31 Cal.4th at p. 926.) Because nothing in the record contradicts this finding, we see no basis for defendant's *Wheeler* claim as to Rose B. (See *People v. Wheeler, supra,* 22 Cal.3d at p. 275 [holding that a party may legitimately challenge a prospective juror based on the juror's appearance or a subjective mistrust of the juror's objectivity].)

██ We further note that five out of the 12 sitting jurors were African-Americans, and four out of those five jurors were women. "While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection." (*People v. Turner* (1994) 8 Cal.4th 137, 168 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Considering the jury's composition in conjunction with our analysis of the prosecutor's proffered reasons for excusing each prospective juror, we conclude defendant has not demonstrated that the prosecutor employed an impermissible group bias.

Even assuming that we must conduct a comparative juror analysis for the first time on appeal (See *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317, 2326, fn. 2]), such an analysis casts no doubt on this conclusion. According to defendant, a side-by-side comparison of two non-African-American jurors who were allowed to serve—Dianne G. and Maria G.—and the prospective jurors struck by the prosecutor establish purposeful discrimination. We disagree.

Contrary to plaintiff's assertions, Dianne G. is not similarly situated to any of the prospective African-American jurors struck by the prosecutor. For example, the prosecutor's decision to question Lawrence H.—but not Dianne G.—about gangs is understandable given the material differences in their background. Lawrence H. worked in the probation department and was a group supervisor for 40 to 50 juvenile delinquents. Given Lawrence H.'s job, the prosecutor reasonably asked him if he had any experience with gangs. In fact, Lawrence H. was very familiar with gangs and even noted that he used to be a gang member. By contrast, nothing in Dianne G.'s jury questionnaire or her answers during voir dire suggested that she had any familiarity with gangs. While her son had been arrested for drug possession and had been involved in a fight where he suffered stab wounds, there was no evidence in the record of gang involvement. As such, the prosecutor's failure to ask Dianne G. about gangs does not cast the prosecutor's reasons for striking prospective jurors "in an implausible light." (*Miller-El v. Dretke, supra*, 125 S.Ct. at p. 2332.)

Likewise, the fact that Dianne G. had served on a prior criminal jury that was unable to reach a verdict does not demonstrate that one of the prosecutor's reasons for striking Rose B.—that she would not fit in—was pretextual. The prosecutor stated that he thought that Rose B. would not fit in with the other jurors because of her unconventional appearance, i.e., her excessive use of jewelry. There is nothing in the record to suggest that Dianne G.'s

appearance was unconventional, and defendant does not make any such claim. Moreover, nothing in the record suggests that Dianne G.'s previous stint as a juror resulted in a hung jury because of her. As such, the prosecutor had no reason to think that she would not fit in with the other jurors.

And Dianne G.'s statement in her jury questionnaire that she believed that LWOP was a more severe punishment than the death penalty does not establish that the prosecutor's proffered reasons for striking other prospective jurors were implausible. In striking prospective jurors because of their perceived hesitancy to impose the death penalty, the prosecutor, with the exception of Rose B., relied *solely* on that juror's answers or demeanor during *Hovey* questioning—and not on the answers on the jury question-naires. And unlike the prospective jurors struck by the prosecutor because of their apparent hesitance during *Hovey* questioning to impose the death penalty, Dianne G. expressed, and the record reveals, *no* such reluctance during *Hovey* questioning. Moreover, aside from the single answer cited by defendant, the rest of Dianne G.'s answers in her questionnaire evinced no apparent reluctance to impose the death penalty. By contrast, Rose B.—the only prospective juror ostensibly struck by the prosecutor because of her answers in her jury questionnaire—wrote that she thought the death penalty was a "horrible thing." As such, Dianne G. is not similarly situated to the African-American jurors struck by the prosecutor and a side-by-side compari-son reveals no pretext in the prosecutor's proffered reasons.

Similarly, and contrary to defendant's assertions, Maria G. is not similarly situated to the prospective jurors struck by the prosecutor. According to defendant, Maria G.'s answers in her jury questionnaire show that she was just as much of a death skeptic as the jurors struck by the prosecutor. But unlike most of those jurors, Maria G. expressed *no* reluctance to impose the death penalty during *Hovey* questioning, and the record reveals no evidence of any such reluctance. Moreover, a careful perusal of Maria G.'s jury questionnaire demonstrates that she did not have the same personal distaste for the death penalty evidenced by Rose B.'s jury questionnaire. For example, while Maria G. did disagree somewhat with the proposition that "[a]nyone who intentionally kills another person without legal justification and not in self defense, should receive the death penalty," her disagreement did not appear to result from a personal distaste for the death penalty. Rather, she reasonably recognized that "every case is different and it has to be looked in its content entirely, death penalty is not for everyone!" Likewise, her uncertainty regarding whether she would vote for LWOP regardless of the evidence and her belief that LWOP was a more severe punishment than death did not appear to result from any visceral reaction to the death penalty. Indeed, Maria G.'s answers to her jury questionnaire also indicated that she believed that "the death penalty should always be considered" in certain circumstances.

And the fact that Maria G. stated in her jury questionnaire that she thought her son had been unfairly treated by the criminal justice system does not demonstrate that the prosecutor's reasons were pretextual. The prosecutor struck no jurors based on their experiences with the criminal justice system. In any event, Maria G. explained that she felt that her son was treated unfairly because of the victim's links to law enforcement. Because the victim in this case had no apparent relationship to law enforcement, the prosecutor could reasonably believe that Maria G. would be a suitable juror. Thus, a side-by-side comparison of Maria G. and the struck jurors casts no doubt on the prosecutor's proffered reasons for striking these jurors.

Finally, we reject defendant's contention that the trial court failed to "conduct a sincere and genuine inquiry into the prosecutor's stated reasons for his challenges." Indeed, this contention is belied by the record. In discussing defendant's last two *Wheeler* objections, the court noted that "I went back and checked my notes on the *Hovey* question, and I have a lot of these jurors marked as potential peremptory because of their manner of responding during the *Hovey*. This is the reason I have been very reluctant to find any type of prima facie violation of the *Wheeler* because I did notice that they were very reluctant. They tried to give an answer that would follow the instructions of the court but they did have problems." The court further explained: "I certainly in making my little notes as I took this, it wasn't because they were Black but I gauged it all on their responses and their demeanor, that I sat here and I made my little notes for myself, just for my own information, and I certainly didn't do it because they were Black." As such, the record establishes that the court did make a "sincere and reasoned effort" to evaluate the prosecutor's "nondiscriminatory justifications." (*People v. Burgener, supra,* 29 Cal.4th at p. 864.)

In any event, no detailed trial court findings regarding the reasons for each peremptory challenge are necessary here. The prosecutor's stated reasons for exercising each peremptory challenge are neither contradicted by the record nor inherently implausible. (See *People v. Reynoso, supra,* 31 Cal.4th at p. 929.)[3] Accordingly, we find no *Batson/Wheeler* error.

### C. *Shackling of Defendant*

Defendant contends the trial court committed numerous errors in relation to his being shackled during the Adkins-Shy trial. Specifically, he alleges the

---

[3] Defendant contends our recent decision in *People v. Reynoso, supra,* 31 Cal.4th 903, violates his rights under the equal protection and due process clauses of the federal Constitution and urges us to reconsider it. Because he presents nothing new, we decline to do so.

court failed to hold a hearing to determine the necessity of shackling, did not give an appropriate admonition to the jury when defendant's leg brace became visible during a witness's testimony regarding his tattoos, and failed to hold a hearing when jurors viewed him being taken into court in chains. He contends these various errors deprived him of his right to due process and other constitutional guarantees under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

With respect to the initial shackling of defendant, it is well settled " 'that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints. . . .' [Citation; fn. omitted.]" (*People v. Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351].) It is equally well settled, however, "that the use of physical restraints in the trial court cannot be challenged for the first time on appeal . . . ." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Defendant failed to make an appropriate and timely objection regarding his shackling on constitutional or any other grounds. In the absence of an objection, the trial court had no opportunity to set forth the reasons it was deemed necessary for defendant to wear leg braces in the courtroom. For all we can determine, had the matter been brought to the court's attention, it would have been fully justified. Having failed to preserve the record, defendant has forfeited this claim on appeal. (*Ibid.*) Moreover, it does not appear that any jurors were aware of the shackling, thus minimizing any possible prejudice. (Cf. *People v. Pride* (1992) 3 Cal.4th 195, 233 [10 Cal.Rptr.2d 636, 833 P.2d 643] [rejecting the defendant's claim that his shackling violated his constitutional rights because his assertion that the jury saw his shackles was "speculative"].)

Defendant contends to the contrary that the jurors did see the leg braces during the testimony of a prosecution witness, Sergeant Holmes, who was asked to identify defendant's tattoos. When the prosecutor sought to show the jury the tattoos, defense counsel objected to having defendant "stand up and parade" in front of them. The court indicated defendant would only need to stand at counsel table and remove his shirt, while Holmes came down from the witness stand. Defendant agreed to this procedure, and the matter proceeded accordingly. Although defendant now contends "[t]here can be no doubt that the jurors saw [his] shackles" at this time, the record fails to support such an assertion; and we will not assume this occurred in the absence of affirmative evidence. (See *People v. Pride, supra,* 3 Cal.4th at p. 233.)

Since the record fails to support defendant's premise that the jurors saw his leg braces, we find no error in the trial court's failure to instruct sua sponte that they should disregard the shackling in their deliberations. (*People v. Medina* (1995) 11 Cal.4th 694, 732 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Finally, defendant contends the trial court erred in failing to hold a hearing when he was brought in chains down a courtroom hallway in the presence of jurors. Defense counsel moved for a mistrial, alleging that, according to defendant, three "or maybe more" jurors had seen him chained and hand-cuffed. The trial court asked the bailiff about the incident. The bailiff explained that the custody elevator usually used to transport defendant to the courtroom had developed mechanical difficulties. Thus, they had to take a different elevator and then come across the hall. He did not think there had been any jurors at the side of the hall they had used. From this explanation, the court concluded "that precautions were taken to bring [defendant] up and not paraded in front of this courtroom" and denied the motion for a mistrial. Although defense counsel reiterated defendant's representation that at least three jurors had seen him, the court reaffirmed its ruling, noting that there had been no other way to get defendant to the courtroom, the jury was aware he was in custody, and precautions had been taken to minimize any exposure. When the court offered to caution the jury not to consider the fact defendant had been brought through the hallway in chains, counsel requested a "more general" admonition not to consider the fact he was in custody, which the court gave.

 Defendant now contends the trial court had a sua sponte duty to conduct a hearing to determine what, if any, effect the shackling had on the jurors. We are not persuaded that defendant preserved the issue for review. Indeed, he failed to object or request a further inquiry, and we can well conceive of tactical reasons for not making such a request. However, even if we assume the court had a duty to act on its own initiative, we find no error. On the record before us, any exposure of the jurors to defendant's shackled condition could only have been extremely brief. "Such brief observations have generally been recognized as not constituting prejudicial error. [Cita-tions.]" (*People v. Duran* (1976) 16 Cal.3d 282, 287, fn. 2 [127 Cal.Rptr. 618, 545 P.2d 1322]; see *People v. Tuilaepa*, *supra*, 4 Cal.4th at p. 584.)

### D. *Admission of Evidence*

Defendant challenges the admissibility of two categories of evidence—eyewitness identification and gang expert testimony—both of which were properly admitted.

#### 1. *Eyewitness Testimony*

At the Adkins-Shy trial, defendant moved to exclude certain eyewitness testimony on the basis of unduly suggestive pretrial identification procedures.

At a hearing on the motion, Deputy Sheriff Danoff testified that he prepared two show-up folders each containing six photographs. He placed Anthony Bereal's photo in the first folder (position 6), and defendant's in the second (position 4). Prior to viewing either of the folders, the witnesses were directed to read an admonition advising them that the suspect may or may not be depicted and they were not obligated to pick any photo.

When the folders were displayed to Donald Jacobs, he was unable to make any identification. Roger Outley identified Bereal's photo, indicating "That's the guy that was doing the talking." Looking at the second folder, Outley stated that the person in position 4 (defendant) looked the most like the one who shot Adkins. Kenneth Sledge, who previously told Danoff that individuals named Carmen and Ant Bug were involved in the shooting, identified defendant's picture as Carmen and Bereal's picture as Ant Bug. He did not indicate whether either was the shooter. Kenneth Shy could not identify Bereal, but stated defendant was the person who shot at him and Adkins.

Several months later and prior to the initial preliminary hearing, the prosecutor again showed the folders to Jacobs, Outley, and Shy and asked them to pick out the assailant. Outley and Shy repeated their identifications; and Jacobs now said he could identify defendant as well. Although the three had been brought to the sheriff's station together to review the photographs, they were interviewed separately.

The trial court denied the motion to exclude the eyewitness identifications, stating that it did "not find anything impermissibly suggestive or anything that might lead to a misidentification . . . ."[4] Defendant now contends the denial of his motion deprived him of his rights under the federal Constitution. We disagree. Defendant bases his argument on speculation that these three witnesses conferred or colluded before and after they made their second identifications and that having them review the folders prior to the preliminary hearing was unduly suggestive as to their subsequent testimony. None of this speculation is supported by the record. Nor were the circumstances in any other respect "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 88 S.Ct. 967].) Moreover, in view of the witnesses' original identifications, the likelihood of any undue suggestiveness was minimal.

---

[4] As a result, Jacobs, Outley, and Shy all testified and identified defendant as Adkins's shooter.

## 2. *Testimony of "Gang Experts"*

Defendant contends the trial court erroneously permitted the testimony of two gang experts, Compton Police Commander Hourie Taylor and Deputy Sheriff Joe Holmes.

Initially, defendant contends the prosecutor impermissibly used fact-specific hypothetical questions to elicit testimony from these experts that a gang member going into rival gang territory—like defendant—would do so as a challenge and would protect himself with a weapon. According to defendant, the specificity of the hypothetical questions converted the answers by the experts into improper opinions on his state of mind and intent at the time of the shooting. As such, the experts were not merely explaining "gang practices or methods generally" but "opining that" defendant "premeditated the crimes." Defendant, however, misconstrues the substance of the testimony. The experts did not render an impermissible opinion as to defendant's actual intent; rather, they properly testified as to defendant's motivations for his actions.

In *People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713], this court recognized that "[t]he subject matter of the culture and habits of criminal street gangs . . . meets [the] criterion [of Evidence Code section 801 defining the admissibility of expert testimony]. [Citations.]" As in *Gardeley*, that matter is "of particular relevance here" (*Gardeley*, at p. 617) considering the circumstances leading to the shooting of Adkins and Shy. Nevertheless, defendant argues that expert testimony as to his being armed with the intention of shooting anyone who issued any form of gang challenge did more than embrace an ultimate issue in the case; it allowed the prosecutor to solicit the experts' opinions as to his mental state through impermissible hypothetical questions. "Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]" (*Id.* at p. 618.)

Defendant relies on *People v. Killebrew* (2002) 103 Cal.App.4th 644 [126 Cal.Rptr.2d 876], in support of his contention the hypothetical questions in this case exceeded permissible limits. In *Killebrew*, the defendant was convicted of conspiracy to possess a handgun after police found a handgun in one of three vehicles occupied by seven gang members and another handgun in the dumpster of a taco stand where the members had stopped. Killebrew was seen in the area of one of the vehicles, and two unidentified men were seen walking away from his location. (*Id.* at p. 648.) "The prosecution theorized that the threat of [rival gang] retaliation compelled the occupants of

the three vehicles to conspire to possess the handgun[s] . . . ." (*Id.* at p. 649.) The prosecution attempted to establish that the defendant had been a passenger in one of the vehicles. "[A] police officer testified as an expert on gangs to establish not only Killebrew's membership in a criminal street gang, but his subjective knowledge and intent to possess [a] handgun." (*Id.* at p. 647.)

On appeal, the defendant challenged the admissibility of the expert's testimony "that when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun," arguing "that these opinions on the subjective knowledge and intent of each occupant in the car were improperly admitted." (*People v. Killebrew*, *supra*, 103 Cal.App.4th at p. 652, fn. omitted.) The Court of Appeal agreed, finding the "testimony is not the type of culture and habit testimony found in the reported cases. *Gardeley* addressed testimony about the primary purpose of the gang, and whether the attack was gang-related activity." (*Id.* at p. 654.) On this basis, the court distinguished cases such as *People v. McDaniels* (1980) 107 Cal.App.3d 898 [166 Cal.Rptr. 12], in which the expert "testified that a person who lived in a gang's territory was automatically associated with that gang by rival gangs, fistfights between gangs normally occur at neutral sites, if a gang traveled to another gang's territory, normally more than a fistfight would occur, and it was unusual for various Crip factions to band together when taking retaliatory action." (*Killebrew*, at p. 656; see also, e.g., *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1367 [37 Cal.Rptr.2d 596].)

We conclude that the expert opinions in this case fall within the gang culture and habit evidence approved in *People v. Gardeley*, *supra*, 14 Cal.4th at page 617. The substance of the experts' testimony, as given through their responses to hypothetical questions, related to defendant's motivation for entering rival gang territory and his likely reaction to language or actions he perceived as gang challenges. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1208–1209 [105 Cal.Rptr.2d 187]; see also *People v. Gardeley*, at p. 619; *People v. Valdez* (1997) 58 Cal.App.4th 494, 508–509 [68 Cal.Rptr.2d 135]; *People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1371.) This testimony was not tantamount to expressing an opinion as to defendant's guilt. (See *People v. Torres* (1995) 33 Cal.App.4th 37, 47–48 [39 Cal.Rptr.2d 103].) Accordingly, we find no abuse of the trial court's discretion in admitting it.

Defendant further contends the prosecutor improperly used expert testimony to enhance witness credibility. Even assuming such testimony is impermissible after Proposition 8 (see *People v. Padilla* (1995) 11 Cal.4th 891, 946–947 [47 Cal.Rptr.2d 426, 906 P.2d 388] [questioning whether such rules for crimes committed after the June 1982 effective date of Cal. Const., art. I, § 28, subd. (d), known as Prop. 8's Truth-in-Evidence provision, were

still in effect], overruled on another ground by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]), we find nothing in the record supporting his assertion that Taylor testified Donald Jacobs was credible or truthful. Taylor was never questioned about Jacobs and never mentioned him. In arguing for the admissibility of the expert testimony, the prosecutor stated he was "trying to bolster the credibility of Donald Jacobs in terms of the truthfulness of his statement as to why he would feel fear in not making the identification . . . ." Defendant now contends this was not the proper subject of expert testimony because the prosecutor failed to identify any misconceptions the jurors might have in this regard that the testimony would dispel. (Cf. *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1302 [283 Cal.Rptr. 382, 812 P.2d 563].) Since he failed to object on this basis, the prosecutor had no chance to respond, and the trial court had no chance to consider whether the evidence should have been excluded for that reason. Accordingly, the claim is forfeited. (See *People v. Wash* (1993) 6 Cal.4th 215, 244 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

 In any event, it is meritless because under the circumstances the trial court would not have abused its discretion in overruling such an objection. Initially, Jacobs had not identified defendant as the shooter when questioned by law enforcement, explaining he was concerned for his safety since he lived in gang territory and his cousin had recently been killed walking home from football practice. Taylor testified that witnesses, even those from rival gangs, are often reluctant to identify or testify against gang members out of fear for their safety. This court has frequently permitted the use of expert testimony to explain to lay jurors conduct that may appear counterintuitive in the absence of such insight. (See *People v. Brown* (2004) 33 Cal.4th 892, 904–908 [16 Cal.Rptr.3d 447, 94 P.3d 574]; *People v. McAlpin, supra*, 53 Cal.3d at pp. 1300–1302; *People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248 [203 Cal.Rptr. 450, 681 P.2d 291].) Invariably, the point of such an explanation is to support another witness's credibility. Assuming a proper foundation for the expert's qualifications, we see no reason to exclude such testimony as it relates to gang activities. A juror unfamiliar with the particulars of gang intimidation may well consider it abnormal for a witness not to want to testify against an individual who committed a violent crime against himself or a family member or friend. If an expert can shed light on such reluctance, the testimony is admissible.

Defendant also raises constitutional objections to the testimony. Assuming the objections were properly preserved for appeal (see *People v. Yeoman* (2003) 31 Cal.4th 93, 117, 133 [2 Cal.Rptr.3d 186, 72 P.3d 1166]), they are without merit for the same reasons.

## E. Instructional Issues

### 1. Failure to Instruct Regarding Accomplice Liability and Credibility Assessment of Prosecution Witness Springer

Defendant contends that at the Stumpf trial the court had a sua sponte obligation to give accomplice liability instructions regarding the testimony of George Springer in light of evidence "it was Springer and not [defendant] who shot Stumpf." As an alternate theory, defendant argues Springer aided and abetted his sale of drugs to Stumpf and was therefore liable for the murder as a natural and probable consequence of that crime. According to defendant, the failure to give this instruction deprived him of his right to due process and other constitutional guarantees. We find no error.

As to the first theory—that Springer was the direct perpetrator of Stumpf's murder—defendant's contention is legally unsound. Although section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given," the law further requires a relationship between the defendant and accomplice, either by virtue of a conspiracy or by acts aiding and abetting the crime. (See *People v. Garceau* (1993) 6 Cal.4th 140, 183 [24 Cal.Rptr.2d 664, 862 P.2d 664].) The record, however, contains no evidence of a conspiracy between Springer and defendant or that Springer somehow aided and abetted defendant in the commission of any crime. As such, the standard instruction on witness credibility (see CALJIC No. 2.20)—including "[t]he existence or nonexistence of a bias, interest, or other motive"—was sufficient to apprise the jury on its consideration of Springer's testimony.

*People v. Gordon* (1973) 10 Cal.3d 460 [110 Cal.Rptr. 906, 516 P.2d 298], relied on by defendant, is distinguishable and does not undermine this conclusion. In that case, the defendant's testimony established a preexisting involvement between him and the prosecution witness he asserted was an accomplice. (*Id.* at pp. 465–466.) The prosecutor also indicated the witness was involved in the crime. (*Id.* at p. 467.) On that basis, this court concluded that the question of whether the witness was an accomplice should have been submitted to the jury along with cautionary instructions on accomplice credibility. (*Id.* at pp. 468–469.) Here, defendant denied being at the scene of the murder, much less having some connection with Springer in its perpetration. The prosecution also never suggested anyone but defendant killed Stumpf. To the extent *People v. Gordon, supra,* 10 Cal.3d at pages 468 to 469, indicated that a witness could be deemed defendant's accomplice in the charged offense even if the evidence of the witness's possible involvement tends to show the witness committed the crime without the defendant's participation, its reasoning on this point is disapproved.

Defendant's second theory of accomplice liability—that murder is a natural and probable consequence of any drug sale—fails for similar reasons. There is no evidence in the record even suggesting that Springer was associated in any way with defendant in the selling of drugs. Indeed, Springer accompanied the unarmed victim who wanted to purchase drugs—and not defendant who was armed while selling drugs. As such, there was no evidence to support an accomplice instruction under a natural and probable consequence theory.

### 2. CALJIC No. 2.92

At the Adkins-Shy trial, defendant asked the court to modify the standard eyewitness instruction, CALJIC No. 2.92, "to add whether the witness's first identification occurred in court as one addition; and, next, the lack of any in-court identification; next, the existence or non-existence of any bias in the identification; next, the existence or non-existence of any suggestiveness in the identification." Defendant based the request for this modification on the testimony of his eyewitness identification expert, Kathy Pedzdek, who testified generally regarding the reliability of eyewitness testimony and who also reviewed the out-of-court statements and in-court prosecution witnesses for factors that would raise a doubt as to the reliability of their identifications of defendant. The court declined the request and gave the standard instruction, which in part directed the jury to "consider the believability of the eye witness as well as other factors which bear upon the accuracy of the witness' identification," including "[t]he extent to which the witness is either certain or uncertain of the identification." (CALJIC No. 2.92 (5th ed. 1988).)

Defendant contends the trial court erroneously included the "level of certainty" factor and should have modified CALJIC No. 2.92 by adding "(1) when a person makes an out-of-court identification he is more likely to repeat the identification in-court and to do so with a greater level of certainty (whether or not the original identification is accurate) because he will now remember the accused from the prior lineup and his identification has been 'validated' by the fact the person whom he identified has been formally accused by the government and is on trial; and, (2) when a witness is asked to make a one-person show-up (identification of the accused) in the court room, the situation is highly suggestive." According to defendant, the instruction and its omissions deprived him of his rights under the Eighth and Fourteenth Amendments of the federal Constitution. We find no error.

With respect to the proposed modification, defendant never requested the additions he now asserts should have been given; and we find no basis for imposing a sua sponte duty to modify CALJIC No. 2.92 as now asserted. (Cf. *People v. Alcala* (1992) 4 Cal.4th 742, 802–803 [15 Cal.Rptr.2d 432, 842

P.2d 1192] [*no sua sponte duty to give* CALJIC No. 2.92].) And even assuming the wording of the standard instruction regarding an eyewitness's level of certainty was erroneous, the error was harmless. Numerous witnesses identified defendant at the scene of the crime and as Adkins's shooter. Moreover, defendant's expert testified that there was no correlation between an eyewitness's level of certainty and the accuracy of his or her identification, and CALJIC No. 2.92 expressly permitted consideration of this testimony. Finally, defendant strongly attacked the accuracy of the eyewitness identifications. Under these facts, it is not reasonably probable that defendant would have obtained a more favorable result absent the alleged error. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1144 [248 Cal.Rptr. 600, 755 P.2d 1049].)

### 3. *Failure to Instruct Regarding the Effect of Provocation on a Finding of Premeditation and Deliberation*

Defendant contends in light of testimony that the murder of David Adkins and the attempted murder of Kenneth Shy may have been precipitated by one or more gang challenges, the trial court's failure to instruct sua sponte that evidence of provocation may reduce a murder from first to second degree violated various constitutional rights. Specifically, he argues the court should have given CALJIC No. 8.73 (5th ed. 1988), which provides: "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."[5] According to defendant, unlike CALJIC No. 8.42, which the court gave, CALJIC No. 8.73 "serves to alert the jury that a lesser provocation, not measured by an 'objective' standard, has legal significance and may suffice to vitiate a finding of premeditation." As such, defendant contends the failure to give this instruction deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

On this record, we find that CALJIC No. 8.73 amounted to a pinpoint instruction on the effect of provocation, a refinement of the basic principles set forth in CALJIC No. 8.42. A pinpoint instruction "relate[s] particular facts to a legal issue in the case or 'pinpoint[s]' the crux of a defendant's case, such as mistaken identification or alibi." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].) A trial court must give a pinpoint instruction, even when requested, only if it is supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39

---

[5] Defendant actually requested the instruction, and the court agreed to give it but for some reason failed to do so.

[61 Cal.Rptr.2d 84, 931 P.2d 262].) ██ The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state. Here, defendant argues gang challenges by Adkins—eventually responding "Neighborhood" to Anthony Bereal's goading—may have emotionally aroused and provoked his assault on the victims. However, the record contains no evidence of what, if any, response defendant had to the purported challenges, assuming Adkins's response was so interpreted. Absent an evidentiary basis, there was no error in the failure to give CALJIC No. 8.73.

### F. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor, in violation of his rights under the federal Constitution, engaged in multiple instances of misconduct during closing argument in the Adkins-Shy guilt trial by improperly vouching for the credibility of prosecution witnesses Jacobs and Outley and expressing his belief that defense witness Belyeu was not believable. Except for one comment, defendant failed to object to any of the statements or seek a curative admonition; and thus the claim is forfeited. (*People v. Prieto* (2003) 30 Cal.4th 226, 259–260 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) Even disregarding this procedural default, we would find no error.

██ " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation] . . . .' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567–568 [280 Cal.Rptr. 631, 809 P.2d 290].) Nevertheless, "[a] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of [his] office behind a witness by offering the impression that [he] has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [his] comments cannot be characterized as improper vouching. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 971 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

██ Considering each of the complained-of comments in context, we find nothing that exceeded these limitations. For example, in telling the jury

that in seeking the death penalty, "I'm going to give you as much reliable, believable and credible evidence as I can" and "[y]ou want truthful testimony to convince a jury," the prosecutor was not attesting to a particular witness's credibility but essentially explaining his assessment of the burden the People must carry to convince 12 jurors of defendant's guilt beyond a reasonable doubt. In referring to Jacobs's testimony—"The only thing I have ever told him is to tell the truth, nothing but the truth, and that's what he did for you"—he was no more than expressing his view of and reasonable inferences from the totality of the evidence. (See, e.g., *People v. Thomas* (1992) 2 Cal.4th 489, 526 [7 Cal.Rptr.2d 199, 828 P.2d 101].) "The fact that comments upon the testimony of certain witnesses made in an argument have been couched in the first person does not of itself render them improper." (*People v. Katz* (1965) 234 Cal.App.2d 413, 419 [44 Cal.Rptr. 354].) The same analysis applies to the prosecutor's remark that Outley's testimony "is the type of evidence I'm talking about that I am relying on in terms of being truthful, believable and credible evidence." Considered in context, this was no more than a comment on the relative quality and strength of this witness in light of his identification of defendant as the shooter.

Nor did the prosecutor improperly attack the credibility of defense witness Belyeu by reference to anything outside the record. The evidence established that Belyeu originally made a statement to the police that Anthony Bereal was the shooter but at trial said it was defendant. In light of this and other inconsistencies, the prosecutor's complained-of remarks are reasonably read as a reminder that the jury must ultimately decide the truth of what it heard.

### G. Cumulative Guilt Phase Error

To the extent there were any errors in the guilt phase, they are minimal. We therefore reject defendant's claim of cumulative error.

### H. Constitutionality of Multiple-murder Special Circumstance

Defendant contends the multiple-murder special circumstance for a prior second degree murder (§ 190.2, subd. (a)(2)) is irrational and deprives him of due process, equal protection, and other guarantees under the federal Constitution, including its Eighth Amendment, because it depends on the fortuity of the order in which the murder convictions occur. If the first murder conviction is for first degree murder—rather than as here, for second degree murder—the special circumstance is inapplicable.

In this case, defendant was initially charged with the Adkins murder; the Stumpf murder was charged eight months later, and the charges were consolidated. When he successfully moved to sever the murder counts, the Stumpf

prosecution proceeded first. Defendant now argues that he would not have been death-eligible had the murders been tried separately in the order charged, because the Stumpf jury found him guilty of only second degree murder.

 Disregarding the fact defendant's argument attempts to take advantage of his successful motion to sever otherwise properly consolidated murder charges, no constitutional violation appears. The Legislature is vested with broad discretion in the classification of punishments, and underinclusiveness rarely justifies invalidating its determination in that regard. "Normally, the widest discretion is allowed the legislative judgment in determining whether to attack some, rather than all, of the manifestations of the evil aimed at; and normally that judgment is given the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious." (*McLaughlin v. Florida* (1964) 379 U.S. 184, 191 [13 L.Ed.2d 222, 85 S.Ct. 283]; see *Warden v. State Bar of California* (1999) 21 Cal.4th 628, 649 [88 Cal.Rptr.2d 283, 982 P.2d 154].) This principle applies equally to the classifications for purpose of death eligibility. (See *In re Anderson* (1968) 69 Cal.2d 613, 632 [73 Cal.Rptr. 21, 447 P.2d 117]; see also *Gregg v. Georgia* (1976) 428 U.S. 153, 186 [49 L.Ed.2d 859, 96 S.Ct. 2909].)

With respect to the multiple-murder special circumstance, the Legislature could reasonably conclude that death eligibility must necessarily be predicated on a conviction for first degree murder with some further qualification such as a prior conviction for either first or second degree murder. We find nothing arbitrary or irrational in this determination simply because in this case, by virtue of defendant's successful severance motion, the order of conviction subjected him to the death penalty. Defendant's argument also depends on the fortuity that although committed first, the Stumpf murder was charged later and consolidated. Had the prosecution on that count proceeded in the order of the crimes, defendant would have been in the same position as actually occurred here. And to the extent defendant contends the multiple-murder special circumstance violates our federal and state Constitutions because it does not require the earlier murder conviction be based on the crime that was committed first, it is meritless under the facts of this case. Here, defendant's earlier murder conviction *was* based on the crime that he committed first. Thus, he suffered no violation of any constitutional guarantee.

Defendant contends, nevertheless, that we must subject the death-eligible classifications to strict scrutiny in light of certain language in *People v. Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375]. As an initial matter, we question whether defendant has adequately identified a group of which he

is a member that has been treated differently than a similarly situated group. Defendant is similarly situated to other defendants charged with a multiple-murder special circumstance and has received the same treatment as those defendants at each stage of the proceedings.

In any event, *Olivas* is inapposite here. That case involved the commitment of a juvenile convicted in adult court to the Youth Authority for a period longer than the applicable prison sentence and the question whether that disparity violated equal protection. In analyzing that question, the court stated that the juvenile had a " 'personal liberty interest' " in being free from incarceration as well as other restraints and controls by the Youth Authority. (*People v. Olivas, supra,* 17 Cal.3d at p. 245; see *id.* at p. 251.) We have recently explained that *Olivas* " 'requires only that the boundaries between the adult and juvenile criminal . . . systems be rigorously maintained' " and does not require " 'the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state . . . therefor.' " (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837–838 [16 Cal.Rptr.3d 420, 94 P.3d 551], quoting *People v. Davis* (1979) 92 Cal.App.3d 250, 258 [154 Cal.Rptr. 817].) In any event, we do not consider *Olivas* controlling here given our prior determination in *In re Anderson, supra,* 69 Cal.2d at page 632, with regard to the former death penalty statute, that "the fixing of penalties for a crime is a legislative function [citations], and we will not nullify the legislative judgment as to the appropriate penalties for the heinous crime of first degree murder. It is for the Legislature and not this court to decide whether it is sound public policy to empower the imposing of the death penalty. [Citation.]" This determination fully accords with the United States Supreme Court's pronouncements as well. (See *Gregg v. Georgia, supra,* 428 U.S. at pp. 186–187.)

Defendant also contends the special circumstance finding must be set aside in light of the United States Supreme Court's recent decision in *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]. According to defendant, the information, which was never amended, charged defendant with the multiple-murder special circumstance codified in section 190.2, subdivision (a)(3)—which requires "multiple murder *when all the offenses in question are tried in the same proceeding*" (*People v. Anderson* (1987) 43 Cal.3d 1104, 1148 [240 Cal.Rptr. 585, 742 P.2d 1306]). Because the murder charges were severed, however, defendant's two murder convictions did not occur in the same proceeding. As such, section 190.2, subdivision (a)(3) did not apply. Thus, defendant contends the special circumstance finding must be reversed because the jury was not and could not be required to make such a finding in violation of *Blakely.*

Defendant, however, ignores the actual findings of the jury. As defendant correctly observed at trial, once the trial court severed the murder charges

against defendant, section 190.2, subdivision (a)(2)—which requires a prior conviction of "murder in the first or second degree"—applied. The trial court recognized this and correctly instructed the jury on the elements of the multiple-murder special circumstance found in section 190.2, subdivision (a)(2). And, based on this instruction, the jury found as true the special circumstance codified in section 190.2, subdivision (a)(2). As such, the special circumstance finding underlying defendant's judgment of death was made by a jury as required by *Blakely*.

To the extent defendant contends his judgment of death must be reversed because the prosecutor failed to amend the information, his contention fails. As an initial matter, no such amendment was arguably necessary because section 190.2, subdivision (a)(2) and section 190.2, subdivision (a)(3) "are plainly complementary, and were evidently intended to define *a single basic special circumstance—multiple murder*—which can be satisfied by convictions in a single proceeding or in more than one proceeding." (*People v. Anderson, supra,* 43 Cal.3d at p. 1149, italics added.) In any event, defendant, by accepting the jury instruction and the jury's finding on the allegedly uncharged special circumstance, acquiesced in the special circumstance finding. Indeed, defendant expressly acknowledged that severance of his murder charges would result in the application of section 190.2, subdivision (a)(2). As such, no amendment of the information was necessary, and we reject defendant's *Blakely* challenge. (See *People v. Toro* (1989) 47 Cal.3d 966, 973, fn. 4 [254 Cal.Rptr. 811, 766 P.2d 577] [" 'when the defendant acquiesces in conviction of an uncharged offense . . . no amendment [of the indictment or information] is necessary' "], disapproved on another ground by *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3 [76 Cal.Rptr.2d 239, 957 P.2d 928].) In order that the form of judgment conform precisely to the jury's verdict, however, we will order the judgment modified to reflect that the special circumstance found true was existence of a prior murder conviction under section 190.2, subdivision (a)(2).

## I. *Refusal of Defense Instructions*

Defendant requested the following instruction on lingering doubt: "Each individual juror may consider as a mitigating factor residual or lingering doubt as to whether the defendant intentionally killed the victim. Lingering or residual doubt is defined as the state of mind between beyond a reasonable doubt and beyond all possible doubt." Finding no authority for such an instruction, the trial court declined to give it, but indicated counsel were not precluded from arguing lingering doubt in mitigation. Defendant now contends the failure to give the instruction violated his rights under the federal Constitution. We disagree.

This court has consistently held that neither federal nor state constitutional law imposes an obligation to give the requested instruction.

(*People v. Lawley* (2002) 27 Cal.4th 102, 166 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Staten* (2000) 24 Cal.4th 434, 464 [101 Cal.Rptr.2d 213, 11 P.3d 968]; see *People v. Cox, supra*, 53 Cal.3d at pp. 675–679.)

 Defendant nevertheless claims error under state law based on language in *People v. Cox, supra*, 53 Cal.3d at page 678, footnote 20, that in compliance with the trial court's statutory mandate to "charge the jury 'on any points of law pertinent to the issue, if requested' [citations] . . . it may be required to give a properly formulated lingering doubt instruction when warranted by the evidence. [Citations.]" We have since held, however, that such an instruction is generally unnecessary where, as here, the court instructs in the standard terms of section 190.3, factors (a) and (k). (*People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Accordingly, in making its penalty determination, the jury may consider " 'the circumstances of the crime of which defendant was convicted in the present proceeding and the existence of any special circumstance found to be true' [citation] and 'any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial' [citation]. These instructions sufficiently encompass[] the concept of lingering doubt, and the trial court [is] under no duty to give a more specific instruction. [Citations.]" (*Hines*, at p. 1068; see also *People v. Sanchez* (1995) 12 Cal.4th 1, 77–78 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)

Moreover, nothing in the court's ruling precluded counsel from arguing lingering doubt in mitigation, which is precisely what he did. Indeed, counsel even used language paraphrased from the proffered instruction: "You may consider lingering doubt in deciding between whether or not he [defendant] lives in prison without the possibility of parole or if he dies in the gas chamber. That's what it is for." We thus find no error in the refusal to instruct specifically on the point.

 Defendant also faults the trial court for refusing to instruct that "[a] sentence of life without possibility of parole means that the defendant will remain in state prison for the rest of his life and will not be paroled at any time." According to defendant, this refusal violated his rights under the federal Constitution. "The omission[, however,] was entirely proper under California law, since the proffered instruction is inaccurate. The Governor may ameliorate any sentence by use of the commutation or pardon power, and it is thus ' "incorrect to tell the jury the penalty of . . . life without possibility of parole will inexorably be carried out" [citation].' [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 172 [51 Cal.Rptr.2d 770, 913 P.2d 980].) We have further determined that refusal to so instruct does not contravene any constitutional requirement. (*Id.* at pp. 172–173.) In any event,

the proffered instruction adequately informed the jury that defendant "would not be eligible for parole." (*People v. Snow* (2003) 30 Cal.4th 43, 123 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

### J. Constitutionality of California's Death Penalty Law

Defendant raises several contentions regarding the constitutionality of California's death penalty statute. Initially, he argues that the holdings in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], *Sattazahn v. Pennsylvania* (2003) 537 U.S. 101 [154 L.Ed.2d 588, 123 S.Ct. 732], and *Blakely v. Washington, supra,* 542 U.S. 296 [124 S.Ct. 2531], constitutionally mandate instructing a capital jury to (1) find proof beyond a reasonable doubt of aggravating factors, (2) find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, (3) find beyond a reasonable doubt the appropriateness of death, (4) reach unanimity as to the aggravating factors, and (5) presume that life imprisonment without the possibility of parole is the appropriate sentence.

 As to each of these considerations, we have previously determined our death penalty statute withstands constitutional scrutiny. (See *People v. Prieto, supra,* 30 Cal.4th at pp. 262–263, 271; *People v. Jenkins, supra,* 22 Cal.4th at p. 1054.) We have also reexamined these conclusions in light of *Apprendi v. New Jersey, supra,* 530 U.S. 466, *Ring v. Arizona, supra,* 536 U.S. 584, and *Blakely v. Washington, supra,* 542 U.S. 296 [124 S.Ct. 2531], and determined their holdings have not altered our conclusions. (See *People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d 568]; *Prieto,* at p. 275.) We reach the same conclusion with respect to the effect of *Sattazahn v. Pennsylvania, supra,* 537 U.S. 101. In *Sattazahn,* the United States Supreme Court simply reiterated, in the context of a double jeopardy analysis, the basic principle of *Apprendi* we have found inapplicable to California's death penalty scheme—that "if the existence of any fact (other than a prior conviction) increases the maximum punishment that may be imposed on a defendant, that fact . . . constitutes an element, and must be found by a jury beyond a reasonable doubt." (*Sattazahn,* at p. 111.) As we have explained, " '[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without the possibility of parole.' [Citation.]" (*Prieto,* at p. 263.)

 For the same reason, none of the cited cases—*Apprendi, Ring, Sattazahn,* or *Blakely*—affects our prior determination that the jury "may

properly consider evidence of unadjudicated criminal activity involving force or violence under factor (b) of section 190.3 and need not make a unanimous finding on factor (b) evidence. [Citations.] Contrary to defendant's implication, 'the court must instruct, on its own motion, that no juror may consider any alleged other violent crime in aggravation of penalty unless satisfied beyond a reasonable doubt that the defendant committed it [citations]. [Citation.]" (*People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

We also decline to reexamine our determination, consistently reaffirmed, that the death penalty law adequately narrows the class of death-eligible offenders. (*People v. Brown, supra*, 33 Cal.4th at p. 401; *People v. Prieto, supra*, 30 Cal.4th at p. 276.)

### K. *Violation of International Law*

Defendant contends California's death penalty statute is unconstitutional because the use of the death penalty as a regular form of punishment falls short of international norms of humanity and decency and fails to reflect the overwhelming international consensus disfavoring capital punishment. "[W]e have previously considered and rejected the various permutations of defendant's arguments. [Citations.] As succinctly stated in *People v. Hillhouse* [(2002) 27 Cal.4th 469,] 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]: 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]' Since we find no other defect in imposing the death penalty against defendant, we decline to find the law defective based on any provision of international law." (*People v. Brown, supra*, 33 Cal.4th at p. 404.)

### L. *Delay in Carrying Out the Death Penalty*

Defendant argues that his death sentence, confinement, and eventual execution all violate various federal and state constitutional guarantees as well as international law because he "has been on death row for nearly more than twelve years waiting for his automatic appeal to go forward . . . ." He submits no reason for reexamining our consistent determination "that delay inherent in the automatic appeal process is not a basis for concluding that either the death penalty itself, or the process leading to its execution, is cruel and unusual punishment. [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 606 [106 Cal.Rptr.2d 575, 22 P.3d 347].) Additionally, any reliance on international law or extraterritorial decisional law has no bearing on the validity of a death sentence that satisfies federal and state constitutional mandates. (*People v. Brown, supra*, 33 Cal.4th at pp. 403–404; see *ante*, at p. 218.)

### III. DISPOSITION

The superior court's judgment, report of sentence, and commitment to judgment of death are ordered modified to show that the special circumstance found true was previous conviction of murder (§ 190.2, subd. (a)(2)). The judgment is otherwise affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 7, 2005, and the opinion was modified with a change in judgment to read as printed above. Appellant's petition for a rehearing was denied October 26, 2005.