Filed 4/2/13  P. v. Melendez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037581 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. EE907212) |
| v. | |
| JUAN FELIPE MELENDEZ, | |
| Defendant and Appellant. | |

Defendant Juan Felipe Melendez appeals after conviction, by jury trial, of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)),[1] attempted second degree robbery (§§ 664, 211, 212.5, subd. (c)), possession of a silencer (former § 12520), possession of material with intent to make a destructive device (former § 12312), possession of metal knuckles (former § 12020, subd. (a)(1)), dissuading a witness (§ 136.1, subd. (c)(1)), and conspiracy to commit robbery (§ 182, subd. (a)(1)).  The jury found true allegations that he personally used a firearm in the commission of the robbery and attempted robbery (§ 12022.53, subd. (b)), personally used a firearm in the commission of the conspiracy (§ 12022.5, subd. (a)), and was armed with a firearm while dissuading a witness (§ 12022, subd. (a)(1)).  Defendant pleaded guilty to possession of a controlled substance. (Health & Saf. Code, § 11377, subd. (a).)  He was sentenced to a 16-year prison term and ordered to pay a number of fees and fines.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends the prosecutor committed misconduct that was prejudicial as to count 5, his conviction of possession of material with intent to make a destructive device. (Former § 12312.) We will order the judgment modified to include applicable penalty assessments on the fees and fines, but otherwise affirm.

## BACKGROUND

As defendant's argument only concerns his conviction of possession of material with intent to make a destructive device (count 5; former § 12312), our review of the evidence will focus on that count.

### A.    *Robbery, Attempted Robbery, Conspiracy, and Dissuading Counts*

Using the name Lucas Rossi, defendant responded to Craigslist ads placed by Lawrence Dauch, who was selling an expensive watch, and by Pierre St. Cyr, who was selling a video camera. Defendant arranged to meet both men on August 18, 2006. A woman using the name Sophia helped defendant set up the meeting with St. Cyr.

Defendant met Dauch first, robbing him of the watch and then threatened him. A few hours later, defendant attempted to rob St. Cyr of the video camera. In both instances, defendant used a gun with a silencer. He also wore a fedora hat, sunglasses, and a fake mustache in both crimes. In 2009, defendant was identified by fingerprints found on the victims' vehicles.

### B.    *Possession Counts*

On July 22, 2009, officers executed a search warrant at defendant's apartment. They located a silencer, a .22-caliber handgun, three fedora hats, sunglasses, brass knuckles, pills containing MDMA, and a computer. The police also located a plastic bag containing the following items: smokeless gun powder, a roll of electrical tape, a package of rocket motor igniters, two nine-volt batteries, one nine-volt battery wired to a push-button switch, an electrician's tool, a roll of insulated copper wire, a roll of gauged

2

wire, a four-inch piece of PVC pipe with end caps and a small hole drilled into one end, and a seven-inch piece of PVC pipe with a small hole drilled into one end.

### C. Prosecution's Expert

Sergeant Dustin Davis testified as an expert for the prosecution. He worked for the Santa Clara County Sheriff's Office on the bomb squad. He had investigated explosives 95 times during the previous five years and testified as an expert twice before.

According to Sergeant Davis, a pipe bomb can be constructed from PVC pipe or galvanized steel. A person would need to place caps on both ends of the pipe. Gun powder or other flammable material would be placed inside the pipe. The material would need to be ignited. A person could ignite the bomb with a rocket motor hooked up to a battery, with wires running through small holes in the PVC pipes. Thus, the plastic bag found in defendant's apartment contained enough materials to construct two completed pipe bombs. Nothing else would be necessary.

Sergeant Davis did not believe that the materials were intended to be used for model rocket launching. Rockets typically use solid fuel, not powder, because the fuel needs to burn at a steady rate, so the gun powder would need to be mixed with a solvent and then "ramm[ed]" into the pipe. If the gun powder found in the bag was used as fuel, the rocket would simply explode rather than launch into flight. Also, the holes drilled into the ends of the pipe were too small to create the necessary thrust. In order to make a rocket from the materials, a person would need additional items, including a nose, fin, and launch pad. A person would also need to remove an end cap. With the materials in the bag, the rocket would not function; it would be "a catastrophic failure."

Sergeant Davis acknowledged that because the spool of wire found in the bag was only about 20 feet long, it would be dangerous for a person to set off a pipe bomb with the materials in the plastic bag. However, the person could protect himself or herself by placing the bomb on the other side of an object such as a wooden desk.

During Sergeant Davis's testimony, the jury viewed a video of a PVC pipe bomb exploding. In Sergeant Davis's opinion, the materials found in the plastic bag were intended to "be put together and exploded." He did not believe there was any other reasonable use for the items.

### D.    Defense Expert

Eugene Richardson testified as an expert for the defense. He worked as a bomb disposal technician in Florida. Much of his experience with pipe bombs came from his time working on military bases. He had disassembled pipe bombs about eight times. He had not previously testified in court.

Richardson had "a little bit" of experience with model rocketry. He had helped his children play with rocket sets that they had purchased from a hobby store. He had friends who were "nuts about playing with model rockets," and he had once attended a "jamboree" where people were setting off model rockets. He had reviewed some YouTube videos showing the process of making model rockets.

Richardson testified that the concepts behind pipe bombs and model rockets are similar, although they have "[d]ifferent kinds of propulsion systems and different fabrication techniques." He believed it was "kind of a crapshoot" as to what could be made from the materials in the plastic bag. The items could be used to make a model rocket, although a person would need to attach a wooden dowel to the pipe. A person would also need some clay or cement and something to "solidify" the fuel. Richardson believed that the length of wire was consistent with an intent to use the items for model rocketry.

According to Richardson, the items in the plastic bag could "[n]ot directly" be used to make a pipe bomb, because there were no "fragmentation-producing devices." A typical pipe bomb is made out of metal, with metal end caps, not out of PVC pipe, because metal has more potential for destruction than plastic PVC pipes. However, he admitted that a PVC explosion would create shards of plastic, and that a person could put

4

nails inside the pipe to make it more destructive.  He believed a person would need some epoxy cement in order to make a "proper" pipe bomb from the materials in the plastic bag, although he admitted the bomb would still explode without being sealed with epoxy.

Richardson acknowledged he was being paid for his work on this case.  He was paid $50 for his initial opinion and would be paid $69.71 per hour, his regular working wage, for all of the other time he had put in.  He expected to bill for about 20 hours, which would total about $1,500.  He admitted that he probably would not be testifying if he was not going to render an opinion that the materials were likely intended for model rocketry.

### E.     *Charges, Verdicts, and Sentencing*

Defendant was charged, by first amended information, with second degree robbery (count 1; §§ 211, 212.5, subd. (c)), attempted second degree robbery (count 2; §§ 664, 211, 212.5, subd. (c)), possession of a silencer (count 3; former § 12520), possession of a controlled substance (count 4; Health & Saf. Code, § 11377, subd. (a)), possession of material with intent to make a destructive device (count 5; former § 12312), possession of metal knuckles (count 6; former § 12020, subd. (a)(1)), dissuading a witness (count 7; § 136.1, subd. (c)(1)), and conspiracy to commit robbery (count 8; § 182, subd. (a)(1)). The information alleged that defendant personally used a firearm in the commission of the robbery and attempted robbery (§ 12022.53, subd. (b)), personally used a firearm in the commission of the conspiracy (§ 12022.5, subd. (a)), and was armed with a firearm while dissuading a witness (§ 12022, subd. (a)(1)).

Defendant initially pleaded not guilty, but changed his plea to not guilty by reason of insanity prior to trial.  During the guilt phase of trial, he pleaded guilty to count 4, possession of a controlled substance.  (Health & Saf. Code, § 11377, subd. (a).)  After the

jury found him guilty of all remaining counts and found all enhancement allegations true, it found him sane at the time of the offenses.[2]

On November 3, 2011, the trial court imposed an aggregate 16-year prison term. It imposed the two-year lower term for count 1 (robbery), with a 10-year term for the firearm use enhancement. It imposed a consecutive eight-month term for count 2 (attempted robbery), with a three-year, four-month term for the firearm use enhancement. It imposed concurrent terms for counts 3 through 7 (the various possession counts), and it stayed the term for count 8 (dissuading) pursuant to section 654.

Also at the sentencing hearing, the trial court ordered defendant to pay restitution to Dauch. It imposed a $2,000 restitution fine (§ 1202.4, subd. (b)) and imposed, but suspended, a $2,000 parole revocation fine (§ 1202.45). It imposed $240 in court operations assessments (§ 1465.8, subd. (a)(1)), $240 in criminal conviction assessments (Gov. Code, § 70373), a $259.50 criminal justice administration fee (Gov. Code, § 29550), a $10 theft fine (§ 1202.5), plus $28.50 in penalty assessments on the theft fine. The trial court waived penalty assessments associated with the $50 criminal laboratory fee (Health & Saf. Code, § 11372.5, subd. (a)) and the $150 drug program fee (Health & Saf. Code, § 11372.7, subd. (a)).

## DISCUSSION

### A. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during closing argument. He claims the prosecutor impermissibly vouched for the prosecution's expert witness, while also impermissibly denigrating the defense.

---

[2] The jury was only asked to find whether defendant was sane at the time of counts 1, 2, 7 and 8 – the robbery, attempted robbery, conspiracy, and dissuading counts.

6

### 1. Proceedings Below

In addressing count 5, the prosecutor noted that the jury had "heard evidence from experts." She noted that Sergeant Davis had testified that the items found in the plastic bag were "intended for use for a pipe bomb."

The prosecutor then argued, "If you believe Sergeant Davis – which you should, because he demonstrated to you that he had a very vast knowledge of this – but if you choose to believe him, you believe that he described these materials, that all you needed to do was put the powder in the pipe, screw on the end caps, put the fuse in and light it or set off the igniter, then it's a pipe bomb. If you believe Sergeant Davis, which you should, count 5 has been met."

Defense counsel did not object to the above argument. The prosecutor continued by emphasizing that defendant had "everything you need in a pipe bomb" and noting that he had also apparently made the silencer himself.

The prosecutor then discussed the defense theory – that "it's a rocket" – and noted that the theory was based on the testimony of the defense expert. She argued the defense expert had little knowledge about model rockets and noted that he had been "hesitant" to admit that the items could be a pipe bomb. She asked, "Why? Ask yourself. [¶] You'll get an instruction on judging witness credibility. Bias is one of the ways that you can determine – is someone biased when they're being paid by somebody to testify a certain way? [¶] Remember my last question. If you come in here and you testify and you don't say it's a model rocket, you don't get paid. He's a paid expert. You can get experts to come in here in many courts and say whatever they want you to say[.]"

Defense counsel objected at that point, but the trial court overruled the objection. The prosecutor continued her argument by referring once again to Sergeant Davis's testimony that the items "were sufficient to make two pipe bombs." She also reiterated, "His testimony is credible and you should believe it."

7

During his closing argument, defense counsel argued that Sergeant Davis was the biased expert. He argued that "it's not always a result of money, necessarily." In this instance, he argued, Sergeant Davis's bias resulted from his position as a public safety officer. Defense counsel argued that Sergeant Davis saw the world "through cop-colored lenses."

Defense counsel also argued that there were two reasonable interpretations of the evidence and that the jury had to adopt the one that pointed to innocence. He noted that if the materials were used for a pipe bomb, they would leave only plastic shrapnel and do little damage. He noted that according to the defense expert, defendant would only have needed a few other items to make a rocket, and that Sergeant Davis had essentially agreed with that assessment. He reiterated that even if the rocket theory was not "the best explanation," the jury was required to adopt it as long as it was "a reasonable explanation."

In her rebuttal argument, the prosecutor argued that Sergeant Davis was knowledgeable and that he had identified "many things that are wrong with this being a model rocket." She then argued, "The mere fact that an expert from Florida – we're in Silicon Valley. You mean to tell me that you couldn't find one person locally that could say that this is a model rocket? Not one person. Moffett Field's right there. Not one person would come to this court locally to say those items are a model rocket. Think about that for a second. Why? Why? Because it's not reasonable."

Defense counsel objected, but the trial court overruled the objection. The prosecutor continued her rebuttal and soon returned to the subject of "the expert testimony from the defense." She argued, "Think about his demeanor. Think about his testimony. Think about what he was saying. Why would somebody who is coming here … testify to you that something is a model rocket? What's his background in that? He went on the Internet? He got his expertise from YouTube? YouTube is not a source of expert information."

8

The prosecutor argued that ultimately, the defense expert had agreed that the materials would make a pipe bomb. She argued, "He reluctantly said possibly. Reluctantly, because he knows he's here to please the person who's paying him."

At the end of her rebuttal, the prosecutor argued that "the defense[-]hired expert was not reasonable. … [Defendant] happened to have a – have a bag of items that is the worst model rocket you've ever seen because it won't work. That doesn't make sense. It's not logical because it's just not supported by the evidence."

The following day, defense counsel asked for a jury instruction to address the prosecutor's argument about the defense expert. The proposed instruction stated: "Yesterday, the prosecutor suggested during her closing argument that the defense attorney could hire an expert … 'to say whatever he wanted,' …. This suggestion was improper. You are instructed to disregard this remark. You shall not consider this remark in any way during your deliberations."

Defense counsel noted that he had "made a timely objection" but had not asked for an admonition at the time. He specified that his failure to do so was not a tactical decision.

The trial court declined to give the instruction, but reminded the jury that the "statements by the attorneys during the argument are not evidence." The trial court also instructed the jury with CALCRIM No. 222, which reiterated that the attorneys' closing arguments "are not evidence." In addition, the trial court instructed the jury with CALCRIM No. 332, which provided guidance for "evaluating the believability of an expert witness."

### 2. Analysis

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the

9

federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights … but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "  [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)

"If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument.  [Citations.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 111.)  " ' "A prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]  It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.] . . .' " (*People v. Ward* (2005) 36 Cal.4th 186, 215 (*Ward*).)

"In general, ' " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion— and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety.' " ' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1184-1185 (*Young*).)

### a.     Vouching for the Credibility of the Prosecution Expert

Defendant first contends that the prosecutor committed misconduct by arguing that the Sergeant Davis's testimony was "credible and you should believe it."  He contends this constituted improper vouching.

We first observe that none of defendant's objections below concerned the prosecutor's remarks about Sergeant Davis's credibility.  Therefore, this claim may be deemed waived.  (See *Young, supra,* 34 Cal.4th at pp. 1184-1185.)  However, even

assuming that defendant's other objections encompassed these remarks, this claim of prosecutorial misconduct lacks merit.

" '[A] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. . . . However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [her] comments cannot be characterized as improper vouching. [Citations.]' [Citation.]" (*Ward, supra,* 36 Cal.4th at p. 215.)

Here, the prosecutor's argument that Sergeant Davis's testimony was "credible and you should believe it" did not amount to improper vouching. The prosecutor did not suggest that her belief in the witness's credibility was based on any facts outside the record or her own personal knowledge. (Compare *People v. Turner* (2004) 34 Cal.4th 406, 433 [prosecutor referred to his prior experience with the witnesses].) In the context of her argument, it was clear that the prosecutor was referring to Sergeant Davis's experience when she argued that he was credible. The challenged remark followed her argument that the jury should believe Sergeant Davis "because he demonstrated to you that he had a very vast knowledge of this." Thus, the prosecutor "properly relied on facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief. [Citations.]" (*People v. Medina* (1995) 11 Cal.4th 694, 757.)

### b. *Impugning the Defense*

Defendant next contends that the prosecutor improperly denigrated the defense case and trial counsel by emphasizing that the defense expert, Richardson, was paid to give an opinion that the materials in the plastic bag were more likely to be made into a model rocket than a pipe bomb.

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 832.) " 'An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.' [Citation.]" (*Ibid.*)

It is not misconduct for a prosecutor to "remind the jurors that a paid witness may accordingly be biased." (*People v. Arias* (1996) 13 Cal.4th 92, 162.) Thus, our Supreme Court found no misconduct where a prosecutor commented that a defense expert had been paid significant fees to " 'come[] up with something that excuses [the defendant's] responsibility.' " (*People v. Cook* (2006) 39 Cal.4th 566, 613 (*Cook*).) The *Cook* court rejected the defense claim that the prosecutor's argument implied that the expert had given " 'false testimony for a fee,' thereby impugning defense counsel's integrity for having, in effect, bought the expert's testimony." (*Id.* at pp. 613-614; see also *People v. Spector* (2011) 194 Cal.App.4th 1335, 1407 [no misconduct where prosecutor referred to " 'paid-to-say witnesses' "]; *People v. Monterroso* (2004) 34 Cal.4th 743, 783-784 (*Monterroso*) [no misconduct where prosecutor referred to the "industry of these defense experts that bounce around from trial to trial, state to state, collecting good money for testimony"].)

Here, too, the prosecutor's comments about Richardson being paid to give a favorable opinion for the defense were "within the bounds of proper argument." (*Monterroso, supra,* 34 Cal.4th at p. 784.) Moreover, the jury instructions made it clear that the prosecutor's argument was not evidence and that the jury was responsible for evaluating the credibility of the expert witnesses. (See CALCRIM Nos. 222 & 332.) "Defendant offers no reason to believe the jury failed to follow [these] instruction[s]. [Citation.]" (*Monterroso, supra,* at p. 784.) In fact, the prosecutor referred to the jury instructions regarding witness credibility when she argued that Richardson was biased because he was a "paid expert."

12

We conclude there was no prosecutorial misconduct.

## B. Fines and Fees

Our review of the record reveals two jurisdictional errors concerning the fees and fines imposed at the November 3, 2011 sentencing hearing. First, the trial court imposed $240 in court operations assessments (§ 1465.8, subd. (a)(1)) – that is, $30 for each of the eight counts. At the time of defendant's convictions, the court operations assessment was $40 per count. (Stats. 2011, ch. 40, § 6, eff. June 30, 2011; see *People v. Alford* (2007) 42 Cal.4th 749, 759 [fee imposed pursuant to section 1465.8, subdivision (a)(1) serves a nonpunitive purpose and thus does not violate federal or state prohibitions against ex post facto statutes].) We will order the judgment modified to reflect the proper amount of the court operations assessments.

Second, the trial court waived all penalty assessments associated with the criminal laboratory fee (Health & Saf. Code, § 11372.5, subd. (a)) and the drug program fee (Health & Saf. Code, § 11372.7, subd. (a)). However, the penalty assessments are mandatory. (See *People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157; *People v. Voit* (2011) 200 Cal.App.4th 1353, 1374 (*Voit*).)

In *Voit*, this court noted that "there are seven assessments, surcharges, and penalties parasitic to an underlying fine." (*Voit, supra,* 200 Cal.App.4th at p. 1374.) In this case, they are as follows: (1) a 100 percent state penalty assessment (§ 1464, subd. (a)(1)), (2) a 20 percent state surcharge (§ 1465.7), (3) a 35 percent state courthouse construction penalty (Gov. Code, § 70372), (4) a 70 percent additional penalty (Gov. Code, § 76000, subds. (a)(1), (e)), (5) a 20 percent additional penalty for emergency medical services (Gov. Code, § 76000.5, subd. (a)(1)), (6) a 10 percent additional penalty "for the purpose of implementing the DNA Fingerprint, Unsolved Crime and Innocence Protection Act" (Gov. Code, § 76104.6, subd. (a)(1)), and (7) a 10 percent additional

state-only penalty to finance Department of Justice forensic laboratories (Gov. Code, § 76104.7[3]).

We will order imposition of the applicable assessments, surcharges, and penalties.[4]

## DISPOSITION

The judgment is modified in the following respects:

(1) To set the amount of the court operations assessments at $320.

(2) To include the following assessments, surcharges, and penalties on the $50 criminal laboratory fee imposed pursuant to Health and Safety Code section 11372.5, subdivision (a) and the $150 drug program fee imposed pursuant to Health and Safety Code section 11372.7, subdivision (a): a 100 percent state penalty assessment (§ 1464, subd. (a)(1)), a 20 percent state surcharge (§ 1465.7), a 35 percent state courthouse construction penalty (Gov. Code, § 70372), a 70 percent additional penalty (Gov. Code, § 76000, subd. (a)(1)), a 20 percent additional penalty for emergency medical services (Gov. Code, § 76000.5, subd. (a)(1)), a 10 percent additional penalty (Gov. Code, § 76104.6, subd. (a)(1)), and a 10 percent additional penalty to finance Department of Justice forensic laboratories (Gov. Code, § 76104.7).

---

[3] The Government Code section 76104.7 penalty was increased subsequent to the commission of defendant's offenses. (See Stats. 2009-2010, 8th Ex. Sess., ch. 3, § 1, eff. June 10, 2010 [increasing penalty to 30 percent]; Stats. 2012, ch. 32, § 25, eff. June 27, 2012 [increasing penalty to 40 percent].)

[4] Any party wishing to contest this issue may petition for rehearing. (Gov. Code, § 68081.)

14

The clerk of the superior court is ordered to prepare an amended abstract of judgment reflecting these modifications and to forward a copy to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MÁRQUEZ, J.