Filed 7/31/13  P. v. Diaz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046513 |
| v. | (Super. Ct. No. 10CF2797) |
| JOSEPH FELIX DIAZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Daniel Barrett McNerney, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia, Quisteen S. Shum and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Joseph Felix Diaz of one count of first degree murder (Pen. Code, § 187, subd. (a)) and found that, in committing murder, he personally used a firearm (*id.*, § 12022.5, subd. (a)) and discharged a firearm causing death (*id.*, § 12022.53, subd. (d)).[1] The trial court sentenced Diaz to an aggregate term of 50 years to life in prison.

In seeking reversal, Diaz argues (1) by failing to correct the prosecutor's misstatement about the law of self-defense, the trial court allowed the jury to be presented with an erroneous theory of guilt; (2) the trial court committed instructional error by giving CALCRIM No. 522 instead of CALJIC No. 8.73 and by failing to further define the word "provocation" in CALCRIM No. 522; and (3) to the extent his claims of instructional error were forfeited, his counsel was ineffective by failing to request CALJIC No. 8.73 and a further definition of "provocation."

We affirm. We reject Diaz's argument the trial court presented the jury with an erroneous theory of guilt. Although we conclude Diaz forfeited his claims of instructional error, we find no ineffective assistance of counsel.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

In the late afternoon of October 4, 2010, Faustino Armenta was driving a van through a residential area of southeast Santa Ana. Three passengers were inside the

---

[1] The jury acquitted Diaz of street terrorism (Pen. Code, § 186.22, subd. (a)) and did not find he committed the murder for a criminal street gang purpose or for the benefit of, at the direction of, or in association with a criminal street gang. This opinion therefore omits discussion of evidence relating to those charges and allegations.

van with Armenta: Karla Vasquez, Irvins Jimenez, and "Porky." Diaz was riding his bicycle along the same street as the van. One witness testified Diaz was riding his bicycle in the same direction as the van; another witness testified Diaz was riding in the opposite direction.

The people inside the van were yelling. As Diaz pedaled past the van, "minding his business," someone from inside the van threw a bottle at him. The bottle missed Diaz, and he continued pedaling his bicycle down the street. After Diaz rode past the van, Armenta made a left turn. The van hit the curb and stalled.

Armenta and Porky, each holding a beer bottle, immediately got out of the van. Armenta chased Diaz, while Porky, walking at a fast pace, followed. Diaz, who had gotten off his bicycle, ran and took cover between a truck and some bushes. Armenta spotted Diaz and ran toward him. Diaz stepped out from his hiding place and chased Armenta down the street. Diaz was holding a gun.

Armenta veered off toward the opposite corner of the street and tried to duck or get out of the way. At some point, Diaz and Armenta faced off and exchanged words. Diaz fired the gun at Armenta, who threw the beer bottle at Diaz and fled. Diaz chased Armenta until Armenta fell. Diaz stood over him and fired several shots in rapid succession. Diaz then placed the gun in the back of his pants and walked away.

Armenta stood and ran back to the van. He tried to start the engine but was too weak. The passengers removed Armenta from the van, laid him on the ground, and called for an ambulance. Armenta died.

About two hours after the shooting, Officer David Rondou of the Santa Ana Police Department conducted a crime scene investigation. He established the time of the shooting as 5:17 p.m. He found blood on the outside of the van on the driver's side door jamb, broken beer bottles in the street near the van's rear bumper, and an unopened bottle of beer in a nearby gutter. Down the street, between 929 and 931 Oak Street, he found a bicycle and saw a car in a driveway. The car's rear window was shot out.

3

At the base of a tree in front of 931 Oak Street, Rondou found three bullet shell casings from a semiautomatic handgun, and, 150 to 200 feet from there, found three more casings and a bullet slug. A trail of blood led back to the van. Rocky Edwards, a forensic firearm and tool mark examiner for the Santa Ana Police Department, analyzed the shell casings and determined they were fired from the same gun.

On the day after the killing, Dr. Anthony Juguilon, a forensic pathologist, conducted an autopsy of Armenta. Dr. Juguilon located three gunshot wounds, each one with an entrance and corresponding exit. He marked the three wounds as A, B, and C, although he could not determine the sequence of gunshots.

Gunshot wound A was located on Armenta's upper left arm. Dr. Juguilon described it as a superficial, nonlethal wound. Gunshot wound B was located on Armenta's back. The bullet entered Armenta's back from behind the chest cavity, lacerated the right lung and a major artery, and exited through the upper right chest. Dr. Juguilon testified gunshot wound B, which travelled from back to front and upward and rightward, was a lethal injury and an independent cause of death. Gunshot wound C was located on the back of Armenta's right thigh. The bullet entered the back of the thigh, lacerated the femoral artery, and exited through the right groin. Dr. Juguilon testified gunshot wound C, which travelled back to front and upward and leftward, was a lethal injury and an independent cause of death.

Dr. Juguilon testified it was possible for someone who has sustained the type of injuries suffered by Armenta to walk a block before passing out from lack of blood. Dr. Juguilon testified Armenta's official cause of death was multiple gunshot wounds, specifically, wounds B and C.

### DIAZ'S TESTIMONY

Diaz testified in his own defense. He testified that in the late afternoon of October 4, 2010, he was relaxing with three other men in the front yard of a friend's

4

home. He heard what he thought were gunshots or shattering bottles and, looking down the street, saw a van make a U-turn. People in the van were shouting curses at Diaz and the others in the yard. Diaz's friend did not want any trouble and told everyone to leave.

Diaz got on his bicycle and rode toward his girlfriend's house. He was alone and carried a gun in his waistband for protection. The gun had a magazine of bullets, but none of the bullets was chambered.

While Diaz had stopped to talk with some people he knew, the van drove past. The people inside the van said something. The van made a U-turn. Diaz got back on his bicycle and rode away. As the van passed Diaz a second time, he thought he heard gunshots and a car window shatter. Diaz rode past the van. He looked back and saw it had stopped. He thought the people in the van were shooting at him so he got off his bicycle and took cover behind a truck. Armenta ran toward the place where Diaz was hiding. Diaz was scared and thought he was going to die. He did not know whether Armenta was armed. When Armenta was about 15 feet away, Diaz stepped out from his hiding place and fired two or three times in his direction.

After firing the shots, Diaz ran, leaving his bicycle behind. Diaz claimed he was not chasing Armenta and did not know whether any of the gunshots had hit him. After running awhile, Diaz saw Armenta again. Diaz testified he did not know whether Armenta was coming toward him. Diaz did not see a weapon on Armenta. Diaz fired three more shots. Armenta fell, and Diaz quickly walked away.

Diaz got rid of the gun along a bicycle trail and walked to a friend's house. He was arrested three days later.

Diaz testified he believed he was facing a deadly encounter with Armenta and "[i]t was him or me." On cross-examination, when confronted with the Dr. Juguilon's testimony, Diaz denied shooting Armenta in the back. Diaz testified Armenta "kind of like f[e]ll" while being shot, and that could account for Dr. Juguilon's conclusion Armenta was shot in the back. Diaz denied shooting Armenta after he fell.

5

When asked whether he was trying to kill Armenta with the first three gunshots, Diaz replied, "[y]es.  For my own protection, yes."

**DISCUSSION**

**I.**

**The Trial Court Did Not Present the Jury with an
Erroneous Theory of Guilt.**

Diaz argues that, in closing argument, the prosecutor made an incorrect statement about the law of self-defense.  Diaz does not, however, argue prosecutorial misconduct; instead, he argues the trial court erred by not correcting the prosecutor's error with clarifying jury instructions.  He contends that the trial court, by not correcting the prosecutor's mistake, allowed the jury to be presented with conflicting theories of guilt, one of which was erroneous.  We reject this argument because (1) the prosecutor did not make an incorrect statement of the law; (2) Diaz did not object to the prosecutor's statement; and (3) the trial court correctly instructed the jury.

Diaz challenges the following statement made by the prosecutor in closing argument:  "The law says, again, he's not required to retreat.  He doesn't have to run away.  If he's facing deadly force, he doesn't have to run away.  But I go back to [CALCRIM No.] 3474.  You don't get to pursue.  You don't get to pursue when you're not looking at any sort of deadly force.  And he told you from the witness stand that he never saw a gun, a bottle, a knife, anything that could inflict great bodily injury or death on himself, but yet he chose to act."  Diaz's counsel did not object to this statement.

Diaz asserts the prosecutor's statement is an incorrect interpretation of CALCRIM No. 3474.  As read to the jury in this case, CALCRIM No. 3474 stated:  "The right to use force [in] self-defense continues only as long as the danger exists or reasonably appears to exist.  When the attacker withdraws or no longer appears capable of inflicting any injury, the right to use force ends."  The trial court also instructed the

6

jury with CALCRIM No. 3470 (self-defense). As part of that instruction, the court told the jury: "A defendant is not required to retreat. He's entitled to stand his ground and defend himself and if reasonably necessary to pursue the assailant until the danger of death or great bodily injury is passed. This is also true even if safety could have been achieved by retreating."

The prosecutor's argument was consistent with CALCRIM Nos. 3470 and 3474.[2] The prosecutor correctly argued that Diaz was "not required to retreat" and "doesn't have to run away" if he was facing deadly force. The prosecutor then argued Diaz did not have the right to pursue "when you're not looking at any sort of deadly force." That statement is consistent with the part of CALCRM No. 3470, given by the court, stating a victim may pursue the assailant only "until the danger of death or great bodily injury is passed." The prosecutor then argued Diaz was not facing deadly force because he testified he did not see Armenta carrying "a gun, a bottle, a knife, anything that could inflict great bodily injury or death." In so arguing, the prosecutor was properly discussing the evidence and the reasonable inferences to be drawn from it. (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*) ["At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom"].)

Because the prosecutor did not make an incorrect statement of the law, there was nothing for the trial court to correct or clarify, and the jury was not presented with inconsistent theories of guilt.

Reversal would not be warranted even assuming the prosecutor misstated the law. "When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal." (*Morales*, *supra*, 25

---

[2] Diaz does not argue either CALCRIM No. 3474 or CALCRIM No. 3470 incorrectly states the law.

Cal.4th at pp. 43-44.)  Diaz voiced no objection to what he now contends was the prosecutor's misstatement of the law.  He tries to avoid forfeiture of his claim by phrasing it as trial court error in failing to correct the prosecutor's comments and permitting an erroneous legal theory to be presented to the jury.  *Morales* forecloses that argument.

In *Morales*, *supra*, 25 Cal.4th at pages 37, 41, the defendant was convicted of possessing phencyclidine (PCP).  On appeal, the defendant asserted the prosecutor's closing argument misled the jury about the law governing PCP possession.  (*Id.* at pp. 37, 42, 47.)  As in this case, the defendant had not objected at trial to the prosecutor's comments.  (*Id.* at pp. 43-44.)  Instead, relying on *People v. Guiton* (1993) 4 Cal.4th 1116 (*Guiton*) and *People v. Green* (1980) 27 Cal.3d 1 (*Green*), the defendant contended the prosecutor's argument allowed the jury to be presented with an improper theory of guilt, which was based on evidence the defendant had PCP in his system at the time of his arrest.  (*Morales*, *supra*, at pp. 42-43, 46-47.)

The California Supreme Court rejected the defendant's argument.  The court stated:  "[T]he court did not present to the jury a case that was premised on a legally incorrect theory.  The prosecutor arguably misstated some law, but such an error would merely amount to prosecutorial misconduct [citation] during argument, rather than trial and resolution of the case on an improper legal basis."  (*Morales*, *supra*, 25 Cal.4th at p. 43.)  The jury instructions accurately stated the law and were controlling.  (*Id.* at p. 48.)  *Guiton* and *Green* were distinguishable because, in those cases, "the court presented the state's case to the jury on an erroneous legal theory or theories."  (*Morales*, *supra*, at p. 43.)  In *Green*, the jury instructions were "deficient" and in *Guiton*, "a theory unsupported by evidence was presented to the jury in the very trying of the case." (*Morales*, *supra*, at p. 43.)

This case falls squarely within *Morales*.  Here, the trial court did not present to the jury a case premised on a legally incorrect theory.  Diaz does not contend

the jury instructions were erroneous. As did the defendant in *Morales*, Diaz relies on *Guiton* and *Green*, but those cases are inapplicable for the reasons stated in *Morales*. At most, the error asserted by Diaz amounts to "prosecutorial misconduct [citation] during argument," not "trial and resolution of the case on an improper legal basis." (*Morales*, *supra*, 25 Cal.4th at p. 43.)

## II.

### Diaz Forfeited His Claims of Instructional Error.

Diaz argues the trial court erred by instructing the jury with CALCRIM No. 522 instead of CALJIC No. 8.73 on the issue of provocation. He contends that CALCRIM No. 522, unlike CALJIC No. 8.73, failed to advise the jury it may consider provocation in determining whether the defendant acted with or without deliberation and premeditation. He also contends that CALCRIM No. 522 did not inform the jury that provocation included fearing for one's life.

The trial court instructed the jury with CALCRIM No. 522, as follows: "Provocation may reduce a murder from first degree to second degree murder and may reduce murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

CALJIC No. 8.73, also concerning provocation, states: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

9

Diaz argues the trial court erred by giving CALCRIM No. 522 instead of CALJIC No. 8.73, for two reasons. First, he argues, "[CALCRIM No. 522] did not inform the jury that provocation included [Diaz]'s fear for his life." Diaz states he is not challenging the trial court's failure to specifically define "provocation." Instead, he argues, "the court's definition of provocation was not sufficiently broad to overcome the instruction[al] error of CALCRIM No. 522, based on the facts of this case." Second, he argues CALCRIM No. 522 did not inform the jury that provocation "was relevant, not only in determining if the defendant committed murder versus manslaughter, but also in determining whether it negated [Diaz]'s ability to premeditate and deliberate so as to reduce a finding of first degree murder to second degree murder."

Diaz has forfeited his claims of instructional error. "Provocation," as used in jury instructions, bears its common meaning and requires no further explanation in the absence of a request. (*People v. Cole* (2004) 33 Cal.4th 1158, 1217-1218.) Diaz did not object to CALCRIM No. 522 or ask that it be modified or amplified by defining the word "provocation." (*People v. Souza* (2012) 54 Cal.4th 90, 118 ["because the instructions as given were complete and because defendant did not ask the trial court to clarify or amplify them, defendant may not complain on appeal that the instructions were ambiguous or incomplete"].) CALJIC No. 8.73 is a pinpoint instruction on a defense theory and therefore need not be given unless requested by defense counsel. (*People v. Ward* (2005) 36 Cal.4th 186, 214; *People v. Mayfield* (1997) 14 Cal.4th 668, 778.) Diaz did not request the trial court to give CALJIC No. 8.73.

### III.

### There Was No Ineffective Assistance of Counsel.

Diaz argues his trial counsel was ineffective for failing to request CALJIC No. 8.73 and by failing to request an amplification of CALCRIM No. 522 to define "provocation." To prevail on a claim of ineffective assistance of counsel, Diaz must show both (1) his attorney's representation was deficient in that it fell below an objective

standard of reasonableness under prevailing professional standards; and (2) his attorney's deficient representation subjected him to prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Cain* (1995) 10 Cal.4th 1, 28.) Prejudice means a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, at p. 694.) A reasonable probability means a "probability sufficient to undermine confidence in the outcome." (*Ibid.*)

We find no deficient representation of counsel or prejudice from failure to request CALJIC No. 8.73. In addition to CALCRIM No. 522, the trial court gave CALCRIM Nos. 520 and 521. The latter instruction informed the jury that first degree murder requires that the defendant acted "willfully, deliberately, and with premeditation"; that deliberation means a decision to kill after the defendant "carefully weighed the considerations for and against (his/her) choice"; and that premeditation means the defendant "decided to kill before completing the act[s] that caused death." (CALCRIM No. 521.) CALCRIM No. 522 then informed the jury: "Provocation may reduce a murder from first degree to second degree murder and may reduce murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide." Thus, although CALCRIM No. 522 does not expressly state that provocation may negate deliberation and premeditation, the jurors would understand that to be the case based on the instructions as a whole.

In *People v. Hernandez* (2010) 183 Cal.App.4th 1327 (*Hernandez*), the Court of Appeal also rejected a claim that CALCRIM No. 522 was inadequate because it does not expressly tell the jury that provocation is relevant to determining whether the defendant killed without premeditation and deliberation. The *Hernandez* court stated: "In [*People v.*] *Rogers* [(2006) 39 Cal.4th 826], the court evaluated the potential for error when the jury is instructed on provocation as it relates to voluntary manslaughter, but is not instructed on provocation as it relates to second degree murder. [Citation.] The

11

*Rogers* court concluded that the omission of a provocation instruction for second degree murder is not misleading. The court reasoned that 'the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder' and the manslaughter instruction 'does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed.' [Citation.] [¶] As reflected in *Rogers*, the fact that a trial court is not required to instruct on provocation for second degree murder *at all* supports that it is not misleading to instruct on provocation without explicitly stating that provocation can negate premeditation and deliberation. Although CALCRIM No. 522 does not expressly state provocation is relevant to the issues of premeditation and deliberation, when the instructions are read as a whole there is no reasonable likelihood the jury did not understand this concept. Based on CALCRIM No. 521, the jury was instructed that unless defendant acted with premeditation and deliberation, he is guilty of second, not first, degree murder, and that a rash, impulsive decision to kill is not deliberate and premeditated. Based on CALCRIM No. 522, the jury was instructed that provocation may reduce the murder to second degree murder. [¶] In this context, provocation was not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term. [Citation.] . . . Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Hernandez, supra*, at pp. 1333-1334.)

The *Hernandez* court expressed satisfaction "that, even without express instruction, the jurors understood that the existence of provocation can support the absence of premeditation and deliberation." (*Hernandez, supra*, 183 Cal.App.4th at p. 1334.) Thus, the trial court was not required to amplify the instructions given. (*Ibid.*)

12

We agree with *Hernandez*. Because the jurors in this case were instructed with CALCRIM Nos. 521 and 522, they understood that provocation could support the absence of premeditation and deliberation and thereby reduce first degree murder to second degree murder. Thus, trial counsel's performance was not deficient for failing to request CALJIC No. 8.73, and, if deficient, did not result in prejudice.

Diaz tries to distinguish *Hernandez* on the ground the nature of the provocation in this case was different: In *Hernandez*, the provocation was heat of passion, while here, Diaz argues, he was acting in self-defense. This distinction is without a difference because, as we shall explain, the instructions permitted the jury to decide whether Diaz was provoked and acted out of fear for his life. In any case, CALJIC No. 8.73 would not have addressed Diaz's distinction of *Hernandez* because CALJIC No. 8.73, as CALCRIM No. 522, uses the term "provocation" without further definition.

We also find no deficient representation of counsel or prejudice from the failure to request an amplification or a modification of CALCRIM No. 522 on the meaning of "provocation." Absent a request for an amplification or modification, the word "provocation" would have its usual, common meaning. (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1217-1218.) In *People v. Ward*, *supra*, 36 Cal.4th at page 215, the court stated, "[t]he evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state." Provocation has been defined to mean "something that provokes, arouses, or stimulates" (Merriam-Webster's Collegiate Dict. (11th ed. 2004) p. 1002.); provoke means "to arouse to a feeling or action[;] . . . to incite to anger" (*Ibid*.).

In light of this common meaning of provocation, the jury could consider the evidence and decide whether Armenta's conduct prompted or aroused an emotional response in Diaz—i.e., fearing loss of his life—that negated the mental state necessary for murder (malice aforethought) or the mental state necessary for first degree murder

13

(deliberation and premeditation). "Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1334.) Further defining "provocation" in CALCRIM No. 522 to expressly include the emotion of fearing for one's life was unnecessary and, in all reasonable probability, would not have changed the outcome of trial.

In addition, the jury was instructed on voluntary manslaughter on sudden quarrel or heat of passion (CALCRIM No. 570), imperfect self-defense (CALCRIM No. 571), and self-defense (CALCRIM Nos. 505 and 3474). CALCRIM No. 570 permitted the jury to consider whether Diaz's response to provocation was reasonable and, if so, to find him guilty of voluntary manslaughter.[3] CALCRIM Nos. 505, 571, and 3474 permitted the jury to acquit Diaz if it concluded he acted in self-defense with the reasonable belief that the need to use deadly force was reasonably necessary. CALCRIM No. 571 permitted the jury to find Diaz guilty of voluntary manslaughter rather than murder if the jury concluded (1) Diaz actually believed he was imminent danger of being killed or suffering great bodily injury and (2) he actually believed the immediate use of deadly force was necessary to defend against the danger, but (3) at least one of those beliefs was unreasonable. Thus, contrary to Diaz's assertion, the jury was instructed to consider whether Diaz killed Armenta out of the reasonable or unreasonable belief Diaz's life was in danger and to render the appropriate verdict.

---

[3]  CALCRIM No. 570 (voluntary manslaughter on sudden quarrel or heat of passion), states in part: "The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

14

## DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.