Filed 10/17/13  P. v. Howard CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EZEKIAL LADONNE HOWARD,<br><br>    Defendant and Appellant. | F065643<br><br>(Super. Ct. No. F11905164)<br><br>**OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Bruce M. Smith, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Before Kane, Acting P.J., Detjen, J., and Franson, J.

Ezekiel Ladonne Howard was convicted of assault with a firearm and shooting at an occupied vehicle. He contends that the pattern instruction given to the jury on eyewitness identifications, CALCRIM No. 315, was erroneous and unconstitutional because it stated that a witness's level of certainty in making an identification is a relevant consideration. Howard says social science research shows no correlation between an eyewitness's degree of certainty and the accuracy of the witness's identification.

Howard did not object to the instruction at trial and he has not demonstrated that his substantial rights were affected by it. Consequently, he has forfeited the issue and it is unnecessary for us to consider the merits of his contention about the lack of scientific support for the instruction. The judgment will be affirmed.

### *FACTUAL AND PROCEDURAL HISTORIES*

Michael Dixon, a college student, met Judy Tes at a nightclub in August 2011. He had seen her several times when, on September 1, 2011, he offered her a ride to a store. He drove to her home around 11:00 p.m. and parked nearby. A large, dark vehicle pulled up beside Dixon's car with the driver's window facing Dixon's window. The driver signaled to Dixon to open his window. When Dixon did so, the driver asked whether Dixon was waiting to see his (the driver's) sister. Dixon asked who the driver's sister was, and the driver said Judy. Dixon at first thought the driver was Cambodian, like Judy. (Dixon and Howard are African American.)

The driver of the other car drove on and parked about 20 feet away from Dixon. In his rearview mirror, Dixon saw the driver get out. Judy appeared in the street. She and the driver argued. The driver said something like, "you think you're going out with him[?]"

The driver then walked to within about a half a foot from Dixon's car and drew a gun from his pocket. He told Dixon he had 13 seconds to leave. Dixon began driving away. He heard five or six shots. His rear window shattered. He ducked down to take

cover and lost control of the car, which hit a mailbox or a tree, causing the airbag to deploy.

When the police arrived, Dixon told them the shooter was a light-skinned African American around 19 or 20 years old with close-cropped hair. He said the shooter's car was large, dark green, and similar to a Dodge Durango. Officers found 13 spent shell casings on the ground and nine bullet holes in Dixon's car. The next day, an officer showed Dixon a photographic lineup of six pictures. Dixon identified a picture of Howard as the shooter.

The district attorney filed an information charging Howard with two counts: (1) assault with a firearm (Pen. Code, § 245, subd. (a)(2));[1] and (2) shooting at an occupied vehicle (§ 246). The information alleged that Howard personally used a firearm within the meaning of section 12022.5, subdivision (a), in committing count 1, and personally used a firearm within the meaning of sections 667 and 1192.7 in committing count 2.

At trial, Dixon identified Howard as the person who fired the shots at him. Dixon said he first thought the man was Cambodian, when he referred to Judy as his sister, but saw that he was African American when he approached Dixon's car. Another African American man was a passenger in the shooter's car. The passenger had dreadlocks with blond tips. When the shooter approached, he came within half a foot of the open window and was under a street light. Dixon got a good look at him. Dixon described the shooter's skin and hair for the police when they arrived, and especially remembered his eyes. It was the eyes in the lineup photo of Howard that convinced Dixon that Howard was the shooter. Dixon testified that he was sure Howard was the shooter and there was no doubt in his mind.

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

3.

Dixon testified that the day after the shooting, he asked Judy who the shooter was. Judy gave the name Zeke[2] and refused to say more. Dixon found Judy's Facebook page on the Internet. On the page was the name Zeke Howard. Dixon thought Zeke must be short for Ezekiel. He searched and found a picture of Ezekiel Howard on another web page. The picture was of the person who fired the shots. This happened before the police showed Dixon the photographic lineup.

Fresno Police Officer Zebulon Price testified that he spoke with Judy Tes and her sister Brittany on the night of the shooting. Judy was not cooperative that night, and when efforts were made later to interview and subpoena her, she refused to speak to an investigator and an officer on the phone and could not be physically located. Brittany, however, told Price that Judy said a man named Zeke fired the shots, although she said she had not seen the shooting herself. She said Zeke lived on the west side of Fresno, came from Stockton, and was half African American and half Hispanic. Price used this information and a range of birth dates to perform a search in the police department's database. The search found Ezekiel Howard, who had an address in west Fresno and a prior address in Stockton.

Officer Tim Murray testified about the arrest of Howard. Two days after the shooting, Murray pulled over a green Chevrolet Equinox SUV. Murray noticed the Equinox because it had paper license plates. He followed it a short distance until it sped up and made a sudden left turn without signaling. Another car had to swerve out of its way. Murray conducted a traffic stop. Howard told Murray he was lost and his GPS was not working. Murray arrested Howard after finding that he was wanted on the charges in this case. Howard was cooperative. He did not appear surprised and said, "no problem, you guys are just doing your job."

---

[2]The reporter's transcript uses the spelling "Zek." We are using "Zeke," as this is the standard spelling for the shortened version of Ezekiel.

Fresno Police Detective Ted Kazarian testified about his interview with Howard. Howard waived his right to remain silent and spoke to Kazarian, but he "was very vague, provided very indefinite answers and very unclear answers."

In her closing argument, the prosecutor emphasized the certainty Dixon felt in identifying Howard as the shooter: "How certain was the victim? I submit to you, ladies and gentlemen, very certain. He was up there. He had no doubt that this is the person [who] did it. None. I can't recall if he said this. My recollection is I think he said 100 percent at some point. No doubt he's certain this is the guy. And he testified to that repeatedly." Later she added, "His testimony, ladies and gentlemen, that this man shot me, I'm 100 percent certain of it, that by itself is enough evidence for you to convict beyond a reasonable doubt." She also said, "He's sure of his identification, clearly sure of his identification."

The jury found Howard guilty as charged and found the gun-use allegations true. The court imposed the middle term of three years for count 1 plus four years for the gun-use enhancement, a total prison sentence of seven years. The court stayed the sentence for count 2 pursuant to section 654.

## *DISCUSSION*

Howard claims the court erred, denied him due process of law, and violated his constitutional right to trial by jury when it instructed the jury with CALCRIM No. 315. As given, the instruction was as follows:

> "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event[?] How well could the witness see the perpetrator[?] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation[?] How closely was the witness paying attention[?] Was the witness under stress when he or she made the observation[?] Did the witness give a description and how does that description compare with the defendant[?] How much time passed between the event and the time

5.

when the witness identified the defendant[?] Was the witness asked to pick the perpetrator out of a group[?] Did the witness ever fail to identify the defendant[?] Did the witness ever change his or her mind about the identification[?] How certain was the witness when he or she made an identification[?] Are the witness and defendant of different races[?] Was the—was the witness able to identify the defendant in a photographic or physical lineup[?] Were there any other circumstances affecting the witness's ability to make an accurate identification[?]"

Specifically, Howard says the instruction is in error because the 11th of the 14 questions the instruction asks—"How certain was the witness when he or she made an identification[?]"—is scientifically unsupported. He cites four articles from scientific journals finding no correlation or even a negative correlation between witness certainty and accuracy of identification. He also cites three out-of-state cases acknowledging the lack of a connection between witness certainty and accuracy. Howard concedes that the California Supreme Court rejected a challenge to the certainty factor in a similar instruction, CALJIC No. 2.92 (see *People v. Johnson* (1992) 3 Cal.4th 1183, 1230-1232), but he maintains that the court did not address any constitutional arguments, so his constitutional claims remain unresolved in California.

Howard did not object to CALCRIM No. 315 at trial. We ordinarily do not consider claims of error where an objection could have been, but was not, made in some appropriate form at trial. It is usually unfair to the trial court and the adverse party to take advantage of an error on appeal which could have been corrected during the trial. (*People v. Saunders* (1993) 5 Cal.4th 580, 590; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1.) The trial court had no obligation to modify the instruction sua sponte. (*People v. Ward* (2005) 36 Cal.4th 186, 213-214.) An asserted constitutional error is not forfeited on appeal if the same action of the trial court was objected to for nonconstitutional reasons (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809) but it is forfeited where, as here, no objection to the court's action was made at all.

6.

As Howard points out, however, section 1259 allows us to review jury instructions to which no objection was made at trial if the instructions affected a defendant's substantial rights. We will, therefore, consider whether Howard's substantial rights were affected by the certainty factor in CALCRIM No. 315. This is essentially the same analysis as whether the error, if any, was prejudicial, which requires us to determine whether there is a reasonable probability of a different result without the error. (*People v. Elsey* (2000) 81 Cal.App.4th 948, 953, fn. 2.)

Dixon's identification of Howard was corroborated. Officer Price testified that Judy told Brittany that Howard was the shooter. Further, Dixon's identification was supported by several of CALCRIM No. 315's factors other than the certainty factor. Dixon saw the shooter when the shooter was standing half a foot from Dixon's car window and was illuminated by a street light. Dixon gave the police an accurate description of Howard. He identified Howard in the photographic lineup only a day after the shooting. He never failed to identify Howard or changed his mind about the identification. Dixon and Howard are of the same race. In light of these considerations, we conclude that Howard has not shown a reasonable probability of a different outcome if the certainty factor had been omitted, and has not shown that his substantial rights were affected by the asserted error. The issue therefore is forfeited.

## DISPOSITION

The judgment is affirmed.

7.